**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| In re: Infinity Business Group, Inc., | ) | Civil Action No. 3:19-cv-03096-JMC |
| | ) | |
| Debtor. | ) | |
| ⸻⸻⸻⸻⸻ | ) | |
| | ) | |
| Robert F. Anderson, as Chapter 7 | ) | |
| Trustee for Infinity Business Group, Inc., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Wade Cordell; O. Bradshaw Cordell; | ) | |
| Cordell, L.L.C.; The Cordell Group, L.L.C.; | ) | |
| Gibson Commons, L.L.C.; Bryon K. | ) | |
| Sturgill; Sturgill & Associates Inc.; | ) | |
| John F. Blevins; Law Offices of John F. | ) | |
| Blevins, L.L.C.; Golden Ghost, Inc.; | ) | |
| Haines H. Hargrett; Donald Brent Grafton; | ) | |
| D. Larry Grafton; Grafton and Company, | ) | |
| P.L.L.C.; Morgan Keegan & Company, Inc.; | ) | |
| and Keith E. Meyers; | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| Of whom Morgan Keegan & Company, Inc. | ) | |
| and Keith E. Meyers are, | ) | |
| | ) | |
| Appellees. | ) | |
| ⸻⸻⸻⸻⸻ | ) | |

This matter is before the court by way of an appeal by Appellant Robert F. Anderson ("Trustee"), as the Chapter 7 Trustee for Infinity Business Group, Inc. ("IBG"), from an order and judgment filed on October 15, 2019, by the United States Bankruptcy Court for the District of

South Carolina ("Bankruptcy Court"). (CV ECF No. 1 at 1.)[1] For the reasons set forth below, the court **AFFIRMS** the Bankruptcy Court's order and judgment.

## I.    RELEVANT BACKGROUND

To support its findings, the Bankruptcy Court set forth detailed findings of fact. (AD ECF No. 1058 at 5-70.) This court will not set aside the Bankruptcy Court's factual findings unless clearly erroneous and will only reference herein factual findings by the Bankruptcy Court that are pertinent to the analysis of the issues on appeal.

The Trustee's claims arise from the collapse of IBG, a payment processing company that specialized in collecting bad checks. (*Id.* at 5, 6, 13.) IBG would collect checks with insufficient funds when first presented for collection ("NSF Checks") then obtain state-mandated recovery fees ("Service Charges") upon the successful collection of the check. (*Id.* at 6.)

IBG offered two (2) programs for collecting NSF Checks: the Guaranteed Program and the Non-Guaranteed Program. (*Id.*) Under the Guaranteed Program, IBG would become the owner of the NSF Check by paying its customer the face value of the check. (*Id.*) Upon any collection, IBG would receive both the face value of the check and the applicable Service Charge. (*Id.*) In contrast, ownership of the NSF Check remained with the customer under the Non-Guaranteed Program. (*Id.*) Accordingly, upon collection of an NSF Check under the Non-Guaranteed Program, IBG would retain the applicable Service Charge and deliver the face value of the check to its customer. (*Id.*)

---

[1] Citations to the record herein contain the relevant document number preceded either by the letters "CV" denoting that the document is listed on the docket in Civil Case No. 3:19-cv-03096-JMC, the letters "AD" denoting that the document is listed on the docket in Bankruptcy Case No. 12-80208-JW, or the letters "BK" denoting that the document is listed on the docket in Bankruptcy Case No. 10-06335-JW.

Throughout its operations, IBG was managed by a Board of Directors ("Board") and several key officers, including the following individuals who are relevant to this matter:

- Bryon Sturgill ("Sturgill"): Sturgill was IBG's Chief Executive Officer ("CEO") and a member of its Board from its founding until July 19, 2010. As part of Sturgill's duties from 2003 to September 2006, he reviewed and prepared the company's financial statements and effectively served as IBG's Chief Financial Officer ("CFO"). During that period, he was also responsible for providing the Board with all financial information and hiring IBG's outside accounting firm, Grafton & Company, PLLC ("Grafton"). On the company's website, Sturgill represented that he was a certified public accountant ("CPA") when he in fact never passed the CPA exam.

- Wade B. Cordell ("Wade Cordell"): Wade Cordell was IBG's President and Chairman of the Board from 2004 until August 15, 2009. Wade Cordell oversaw IBG's operations and sales, met with prospective customers, and raised capital from individual investors.

- O. Brad Cordell ("Brad Cordell"): Brad Cordell was IBG's Chief Operating Officer ("COO") and a Board member from 2004 until August 15, 2009. Brad Cordell was responsible for managing IBG's daily operations and achieving IBG's financial targets. In addition, he assisted with IBG's capital raises from individual investors.

- Haines Hargrett ("Hargrett"): Hargrett, a CPA, served as IBG's CFO from September 2006 to July 2010. Hargrett was not a member of the Board, but he reported to the Board and frequently attended Board meetings.

- John Blevins ("Blevins"): Blevins served as IBG's general counsel and as a member of the Board from 2004 until August 15, 2009. He was in charge of compliance for IBG and was responsible for all legal issues affecting IBG, including contract review and negotiation as well as providing advice and counsel to IBG's Board, President, and CEO. Blevins also retained and interacted with outside counsel.

- Thomas Handy ("Handy"): Handy served as a member of IBG's Board from June 24, 2008 until March 31, 2010.

- Michael Potter ("Potter"): Potter served as a member of IBG's Board from May 2003 until the Annual Meeting in November 2007 and rejoined the Board in August 2009 until his resignation in August 2010.

- Bill Van Hoeven ("Van Hoeven"): Van Hoeven served on the Board from 2004 until August 31, 2010, when IBG filed its bankruptcy petition. Van Hoeven

> managed IBG's Processing Center in Jacksonville, Florida until September
> 2006.   He subsequently served as IBG's Director of Information and
> Technology and assisted with IBG's capital raises from individual investors.

(*Id.* at 7-8.)  The Bankruptcy Court's order refers to Sturgill, Wade Cordell, Brad Cordell, Hargrett, and Blevins as the "Management Defendants" because they were defendants in the adversary proceeding.  (*Id.* at 9.)  In contrast, the Bankruptcy Court's order refers to Handy, Potter, and Van Hoeven as the "Non-Defendant Directors" because they were not named as defendants in the adversary proceeding.  (*Id.*)

Despite Sturgill's and Hargrett's accounting experience, IBG retained Grafton as its auditor.  Grafton served as IBG's auditor from 2003 to 2009 and issued audited financials for each of those years.  (*Id.* at 10.)

Following its incorporation in 2003, IBG's business and customer base grew rapidly.  (*Id.* at 3, 5.)  IBG's success attracted numerous individual investors, most of whom were family and friends of IBG's founders and key members.  (*Id.* at 3.)  As a result of its rapid growth, IBG and its shareholders aspired to increase the value of the company by attracting a purchaser, merging with another company, or pursuing an initial public offering ("IPO").  (*Id.*)  To improve IBG's investment prospects, IBG began using an accounting practice that created the appearance that IBG was in a better financial position than it was by incorrectly stating the composition and collectability of its accounts receivable ("Accounting Practice").  (*Id.*)  Although Generally Accepted Accounting Principles ("GAAP") only allow receivables to be reported after they are earned, the Accounting Practice counted Service Charges as receivables before IBG collected the checks associated with the fees.  (*Id.* at 107.)

IBG's success eventually became a double-edged sword.  IBG's rapid business growth and expansion improved IBG's investment prospects, but it also created a constant need for cash.  (*Id.*

at 3.)  Unable to attract sufficient investment to fuel its development, IBG regularly used its customer's funds (the customer's share of the checks collected) to cover IBG's costs and operating expenses with the intention of repaying its customers with other funds that IBG later received.  (*Id.* at 62.)  At any point in time, the deficit in client accounts ranged from $200,000 to $2.9 million. (*Id.*)

On March 16, 2006, IBG entered into an engagement agreement ("2006 Contract") with Morgan Keegan & Company, Inc. ("Morgan Keegan"), a brokerage and investment banking firm. (*Id.* at 15.)  The 2006 Contract provided that Morgan Keegan would serve for a period of one (1) year as IBG's exclusive placement agent  in exchange for a six (6) percent commission on all gross proceeds raised on behalf of IBG from a private equity placement.  (*Id.*)

 After a potential investor withdrew its proposal, IBG and Morgan Keegan terminated the 2006 Contract on October 31, 2006.  (*Id.* at 33.)  Morgan Keegan discontinued its efforts to find institutional investors interested in investing in IBG after the 2006 Contract ended but IBG's managers, officers, employees, and Board members continued to sell securities to investors directly.  (*Id.* at 33, 43.)  After the 2006 Contract concluded, Keith E. Meyers ("Meyers"), a Vice President at Morgan Keegan who led the firm's efforts to find an institutional investor for IBG, continued to occasionally correspond with IBG's management and personally invested $25,000 in IBG on November 20, 2006.  (*Id.* at 35.)

On April 24, 2008, IBG and Morgan Keegan entered into a second contract ("2008 Contract"), in which Morgan Keegan agreed to be IBG's exclusive financial advisor with respect to a possible mezzanine debt financing in exchange for a contingent placement fee equal to three (3) percent of the gross proceeds Morgan Keegan raised on IBG's behalf.  (*Id.* at 44-45.) The 2008

Contract concluded on October 24, 2008 by its terms, ending Morgan Keegan's service to IBG. (*Id.* at 57.)

At some point in 2009, certain IBG shareholders alleged that Wade Cordell, Brad Cordell, and Blevins caused IBG's misappropriation of funds from the customer accounts and organized an effort to remove them ("Initial Ouster"). (*Id.* at 63.) Wade Cordell, Brad Cordell, and Blevins were purportedly removed from the Board and terminated from their officer positions on August 17, 2009.[2] (*Id.*) Thereafter, IBG's Board expanded to nine (9) members. (*Id.* at 64.) Sturgill, Handy, and Van Hoeven remained from the former Board and Potter, Jeffrey Lyle, James E. Beasley III, William G. Reed, Eason Leake, and Paul H. Newberry were added as new members. (*Id.*) On July 19, 2010, IBG's Board held a special meeting and voted to remove Hargrett as CFO and Sturgill as a Board member and as CEO. (*Id.* at 69.)

During the twelve (12) months the new Board was in place, IBG continued to attract new customers, received interest from a buyer, and directly raised capital through stock sales. (*Id.* at 69.) However, it also continued to rapidly lose money. (*Id.*) Due to its financial struggles, IBG filed for relief under Chapter 7 of the Bankruptcy Code on September 1, 2010. (BK ECF No. 1.) Two (2) years later, the Trustee commenced an adversary proceeding on behalf of IBG against IBG's former managers and third-party service providers for their alleged involvement with the Accounting Practice. (AD ECF No. 1.) Prior to trial, many of the individual Defendants defaulted, confessed judgment, or entered into settlements with the Trustee, leaving Morgan Keegan and

---

[2] As the Bankruptcy Court noted, there appears to be a significant dispute about whether the ousting was appropriate and whether a legally sufficient percentage of shareholders voted in favor of the removal. (AD ECF No. 1058 at 63 n.35.) For the purposes of this Order, the court does not need to address whether the removal of Wade Cordell, Brad Cordell, and Blevins was appropriate or legal under controlling law.

6

Meyers (collectively, "MK Defendants") as the remaining defendants at trial.[3] (AD ECF No. 1058 at 4.)

On April 23, 2018, the Bankruptcy Court commenced an eighteen (18) day bench trial on the Trustee's claims against the MK Defendants. (AD ECF Nos. 844; 1058 at 4.) The Trustee asserted four (4) causes of action against the MK Defendants: (1) securities fraud under Rule 10b-5(a) and (c); (2) common law fraud; (3) breach of fiduciary duty; and (4) aiding and abetting a breach of fiduciary duty. (AD ECF No. 1058 at 70.) The Trustee proposed the following narratives to establish the MK Defendants' liability:

First, the Trustee assert[ed] that Meyers and Morgan Keegan were actively involved in, colluded or schemed with the Management Defendants in creating and introducing the Accounting Practice used by [IBG] to recognize its accounts receivable with the intent of inflating [IBG]'s revenues in order to overvalue [IBG] and make it appear more profitable, the benefits of which would be realized by a higher commission for Meyers and Morgan Keegan upon any ultimate sale, merger, or [IPO] of [IBG]. However, as an alternative theory, the Trustee assert[ed] that Meyers and Morgan Keegan were aware or should have been aware of the alleged impropriety of the Accounting Practice used by [IBG] and certified by its auditor, Grafton, from 2005 until late 2009, and failed to adequately report it to the company, which resulted in a detriment to [IBG] because it prevented certain non-managing or "innocent" Board members from forcing a change in the Accounting Practice, seeking earlier the ouster of key managers and Board members, or closing the business earlier, which would limit the damages suffered by it.

To establish liability, the Trustee also assert[ed] that Meyers and Morgan Keegan's relationship with [IBG] went beyond their written contractual relationship established in the 2006 Contract and 2008 Contract and that they agreed, either in word or by action, to serve in additional roles, including as [IBG]'s underwriter, its investment advisor, its broker for [IBG]'s offerings to individual investors and its "producing agent." The Trustee assert[ed] that, based on the existence of these alleged other roles, Meyers and Morgan Keegan owed additional fiduciary duties to [IBG] that were breached.

---

[3] The Bankruptcy Court granted a default judgment against Sturgill & Associates Inc.; Sturgill; Donald Brent Grafton; D. Larry Grafton; and Grafton and Company, P.L.L.C. on January 9, 2014. (AD ECF No. 98.) Before trial, the Trustee settled their claims against Blevins; Law Offices of John F. Blevins, L.L.C.; Golden Ghost, Inc., and Hargrett. (AD ECF Nos. 355; 963.) The Cordells; Gibson Commons, L.L.C.; Cordell, L.L.C.; and The Cordell Group, L.L.C. also confessed judgment before trial. (AD ECF Nos. 598; 600; 602; 604; 821.)

> The Trustee also assert[ed] that the Management Defendants, with the assistance of Meyers and Morgan Keegan, looted [IBG] and used capital raised by [IBG] through the use of the Accounting Practice for their own personal benefit.

(*Id.* at 74-75.)  In their defense, the MK Defendants denied creating the Accounting Practice, claimed the Trustee failed to prove the necessary elements of the causes of action, and maintained that the Trustee was barred from bringing the causes of action under the doctrine of *in pari delicto*. (*Id.* at 71.)

On October 15, 2019, the Bankruptcy Court issued a 134-page order finding for the MK Defendants on all of the Trustee's causes of action and entered judgment in their favor.  (AD ECF Nos. 1057; 1058.)  The Trustee appealed the Bankruptcy Court's order and judgment to this court on October 31, 2019.  (CV ECF No. 1.)

The Trustee filed their Opening Brief (ECF No. 17) on May 20, 2020.  The MK Defendants subsequently filed their Response Brief (ECF No. 42) on August 4, 2020 and the Trustee filed their Reply Brief (ECF No. 52) on September 3, 2020.

## II.    LEGAL STANDARD

A district court has jurisdiction to hear appeals from final orders of the bankruptcy court. 28 U.S.C. § 158; *see, e.g.*, *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010) (noting district court's "capacity as a bankruptcy appellate court").  The court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Williams v. Colonial Penniman, LLC*, 582 B.R. 391, 396 (E.D. Va. 2018).  The standard of review of a bankruptcy appeal by a district court is the same as when a court of appeals reviews a district court proceeding.  *See* 28 U.S.C. § 158(c)(2).  Accordingly, the bankruptcy court's findings of fact are reviewed under a "clearly erroneous" standard.  *Dunes Hotel Assocs. v. Hyatt Corp.*, 245 B.R. 492, 495 (D.S.C. 2000).  A finding of fact is clearly erroneous when the

entire record demonstrates convincingly to the reviewing court that "a mistake has been committed." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  A bankruptcy court's conclusions of law are subject to *de novo* review.  *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999); *In re K & L Lakeland, Inc.*, 128 F.3d 203, 206 (4th Cir. 1997).  Mixed questions of law and fact are reviewed under a hybrid standard, "applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining *de novo* the legal conclusions derived from those facts."  *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch*, 80 F.3d 895, 905 (4th Cir. 1996).

### III.    ANALYSIS

The Trustee presents one (1) question of law:

1. Whether the Bankruptcy Court erred as a matter of law by failing to consider the entire record of the adversary proceeding.  (CV ECF Nos. 7 at 2; 17 at 15.)

Furthermore, the Trustee identifies one (1) question of fact:

2. Whether the Bankruptcy Court's "core factual findings" are clearly erroneous.  (CV ECF Nos. 7 at 2; 17 at 15-16.)

The Trustee also raises three (3) mixed questions of law and fact:

3. Whether the Bankruptcy Court erred by holding that the MK Defendants did not owe IBG a fiduciary duty, a duty of due diligence, or a duty to disclose all known material facts.  (CV ECF Nos. 7 at 3; 17 at 16.)
4. Whether the Bankruptcy Court erred by concluding that the Trustee's claims were barred by the doctrine of *in pari delicto*.  (CV ECF Nos. 7 at 3-4; 17 at 16-17.)
5. Whether the Bankruptcy Court's finding that the Trustee did not adequately prove damages caused by the MK Defendants misrepresented the evidence and misapplied the law.  (CV ECF Nos. 7 at 4-5; 17 at 17-18.)

The court will address each issue in turn.

**1.  Whether the Bankruptcy Court erred as a matter of law by failing to consider the entire record of the adversary proceeding**

    a.  <u>The Bankruptcy Court's Proposed Order Procedure</u>

The bench trial addressed IBG's business operations from 2004 to 2010.  (AD ECF No. 1058 at 71.)  Given the breadth of the proceeding, the parties proposed nearly 2,000 exhibits, submitted almost 700 exhibits, and presented eighteen (18) days of witness testimony to establish their respective positions.  (*Id.* at 77.)  To facilitate the Bankruptcy Court's review of such an extensive record, it instructed the parties on the first day of trial that "post-trial briefs would be in the form of proposed orders[.]"  (*Id.* at 71.)  The Bankruptcy Court explained that it would "look at those proposed orders for reference to exhibits" and "in essence, only review [those referenced] in [the] orders."  (*Id.*)  It also told the parties, "You will have, by failing to list an exhibit, waived the Court's review of that [exhibit]."  (*Id.*)

The Bankruptcy Court provided a similar directive to the parties at the conclusion of trial, instructing that "for the Court to pay proper attention to any exhibits, they must be cited in the [respective] proposed order[s] to the Court.  The Court will rely on the documents that you cite to it[.]"  (*Id.* at 71 n.38.)  It later reiterated that "[i]n the [parties'] proposed orders, the parties shall cite to specific exhibits for the Court's consideration.  Failure to cite to a specific exhibit may result in a waiver of the Court's consideration of that exhibit and any argument related thereto."  (*Id.*)  It then set a 100-page limit for the parties' proposed orders.  (*Id.* at 72.)

Both parties agreed to the proposed order procedure.  On the seventh day of trial, May 1, 2018, the Bankruptcy Court informed the parties that "reference to important evidence . . . will have to be mentioned in your respective proposed orders . . . for the Court to observe it[.]"  (CV ECF No. 43 at 81.)  The Bankruptcy Court then warned the parties that "[t]he consequence of the failure to cite [evidence], will be that the Court [is] relieved of the responsibility of knowing they

10

[sic] importance of that document or evidence[.]" (*Id.* at 82.) The Trustee's counsel then responded, "[t]hat is more than fair, Your Honor." (*Id.*) The Bankruptcy Court subsequently asked defense counsel whether the procedure "suit[ed]" the MK Defendants. (*Id.*) Defense counsel replied, "[y]es, Your Honor." (*Id.*)

    b.  The Parties' Arguments

The Trustee claims that the Bankruptcy Court "erred as a matter of law by consciously and deliberately ignoring evidence not cited in the parties' proposed orders[.]" (CV ECF No. 17 at 66.) He contends that the Bankruptcy Court "consciously elected to abrogate its duty to review the entire record by instead determining it would only review evidence cited by the parties in their page-limited proposed orders." (*Id.* at 67.) Specifically, the Trustee alleges that the Bankruptcy Court's erroneous factual findings were "the product" of the Bankruptcy Court's "self-imposed restriction on the evidence it would consider" and "a more general failure to review all of the evidence in the record[.]" (*Id.* at 66-67.)

The MK Defendants counter that the Bankruptcy Court fulfilled its duty to consider the entire record. (CV ECF No. 42 at 15.) First, the MK Defendants argue that the trial court did not limit its decision to evidence cited in the parties' post-trial proposed orders as the Trustee claims. (*Id.* at 16.) Second, they claim that the Trustee waived any objections to the procedure adopted by the Bankruptcy Court for post-trial submissions by stipulating to the process. (*Id.* at 16-17.) Third, the MK Defendants maintain that the Trustee has not cited any evidence that the trial court refused to consider solely because it was not included in the Trustee's proposed order. (*Id.* at 17.)

    c.  Analysis

Given the extensive record in this case, it was appropriate for the Bankruptcy Court to request proposed orders limited to 100 pages. Inviting the parties to submit proposed findings of

fact and conclusions of law "is well established as a valuable aid to decision making." 9C ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2578 (3d ed. 2020). In fact, "the presentation of proposed findings by the parties may help the court to avoid error." *Id.* Additionally, setting a reasonable page limitation for briefs and memoranda is a common practice to encourage a concise presentation of the relevant arguments and evidence. As the Bankruptcy Court's order notes, the local rules for both the District of South Carolina and the Court of Appeals for the Fourth Circuit contain page limitations. *See, e.g.*, Local Civ. R. 7.05 (D.S.C.) ("Unless an exception is granted by the court, no memorandum shall exceed: [t]hirty-five (35) double-spaced pages, in the case of an initial brief of any party"); Local App. R. 32(b) (4th Cir.) ("The Fourth Circuit encourages short, concise briefs. Under no circumstances may a brief exceed the length limitations in FRAP 32(a)(7) and FRAP 28.1(e)(2) without the Court's advance permission.").

Nonetheless, the Trustee waived any objections to the Bankruptcy Court's proposed order procedure by agreeing to the procedure at trial. Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Here, the Trustee waived its right to challenge the Bankruptcy Court's proposed order procedure by affirmatively agreeing to the procedure at trial.

But while the Trustee waived any objections to the proposed order procedure, they did not waive their right to challenge an alleged abuse of the proposed order procedure. The Bankruptcy Court's proposed order instructions did not suggest that the Bankruptcy Court would never consider exhibits omitted from the parties' proposed orders. Instead, they informed the parties that the exhibits cited in the proposed orders would frame the Bankruptcy Court's consideration of the matters presented. (*See, e.g.*, AD ECF No. 1058 at 71 n.38 ("[F]or the Court to pay proper attention to any exhibits, they must be cited in the [respective] proposed order[s] to the Court. The Court

will rely on the documents that you cite to it[.]").)  Accordingly, there is no evidence before the court suggesting that the Trustee agreed to a procedure that did not entail a review of all of the evidence in the record.  Therefore, the court will consider the Trustee's argument that the "Bankruptcy Court erred as a matter of law by consciously and deliberately ignoring evidence not cited in the parties' proposed orders" on the merits.  (CV ECF No. 17 at 66.)

After trial, the Bankruptcy Court issued its order pursuant to Federal Rule of Civil Procedure 52, made applicable to the proceedings below by Federal Rule of Bankruptcy Procedure 7052.  (AD ECF Nos. 966; 1058 at 4.)  Rule 52 provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  "It is clear from the language of Rule 52(b) that the duty to make findings of fact after a bench trial exists independently of any request by a party to the litigation." *United States ex rel. Belcon, Inc. v. Sherman Const. Co.*, 800 F.2d 1321, 1324 n.2 (4th Cir. 1986). Accordingly, a court has both the right and the duty to weigh the evidence and draw reasonable inferences and deductions after a bench trial.  *United States v. Bales*, 813 F.2d 1289 (4th Cir. 1987) (where jury trial is waived, judge weighs the evidence, determines the credibility of the witnesses, and finds the facts).

Here, it is clear that the Bankruptcy Court fulfilled its duty to make factual findings by reviewing the record, weighing the evidence, and drawing reasonable inferences and deductions from the evidence.  Although the Bankruptcy Court "relied heavily on the proposed orders submitted by the parties in considering this matter[,]" it "reviewed all evidence submitted to it[.]" (*Id.* at 72.)  The "case law evidence, and arguments presented in the proposed orders . . . framed the [Bankruptcy] Court's consideration of the matters presented" while "the arguments, evidence

and case law that were only briefly mentioned or not mentioned at all in the proposed orders were weighed accordingly." (*Id.*)

Moreover, the Trustee has not cited any evidence that the Bankruptcy Court refused to consider solely because it was not included in the Trustee's proposed order. The Trustee generally alleges that the Bankruptcy Court's factual errors were "the result of the court's review only of evidence cited in the parties' proposed orders, a more general lack of support in the record, or a refusal to consider contrary evidence[.]" (CV ECF No. 17 at 68.) But despite devoting eleven (11) pages of its Opening Brief to alleged factual errors, the Trustee fails to cite a single specific instance where the Bankruptcy Court failed to evaluate evidence omitted from the Trustee's proposed order. (*See id.* at 68-77.) Upon its own review of the record, the court cannot discern an instance where the Bankruptcy Court failed to consider evidence or testimony not cited by the Trustee's proposed order. Thus, the court finds that the Bankruptcy Court fulfilled its duty to make factual findings by considering the entire record and did not err as a matter of law.

**2.  Whether the Bankruptcy Court's "core factual findings" are clearly erroneous**

a.  The Parties' Arguments

The Trustee claims that the following "core factual findings" in the Bankruptcy Court's order are clearly erroneous:

     i.     "[T]he [MK Defendants] did not cause [IBG] to implement or continue utilizing the fraudulent accounting practices that led to IBG's demise;"

     ii.    "[T]he MK Defendants were unaware or had insufficient knowledge of red flags and other indicia that the fraudulent accounting practices they helped create and perpetuate violated Generally Accepted Accounting Principles at the outset;"

     iii.   "[T]he MK Defendants did not conceal the fraudulent nature of the accounting practice from IBG's innocent directors and management, investors, and potential investors;"

     iv.   "[T]he MK Defendants did not knowingly and substantially participate in or encourage the Management Defendants' breaches of fiduciary duty to IBG;"

     v.    "[T]he MK Defendants did not breach their fiduciary duties and duty to disclose to IBG;"

14

vi.  "IBG's innocent directors and management did not participate in the day to day operation and management of IBG, and they lacked the ability to control the Company; and"

vii.  "IBG's innocent directors, management, and advisors failed to discharge their duties to the Company and were aware of the fraudulent nature of the accounting practice and the misconduct of the MK Defendants and the Management Defendants."

(CV ECF Nos. 7 at 2; 17 at 66.)  However, the Trustee contends in their Opening Brief that the Bankruptcy Court's factual errors are not confined to the seven (7) alleged factual errors in the Statement of Issues.  Instead, the Trustee maintains that "[i]t is impossible to capture every clearly erroneous finding the Bankruptcy Court made" and contends that the seven (7) factual errors previously alleged merely " highlight[] a number of the Bankruptcy Court's factual errors[.]"  (CV ECF No. 17 at 68.)  In support of their argument, the Trustee commits eleven (11) pages of their Opening Brief to rebutting the Bankruptcy Court's factual findings.  (*Id.* at 68-79.)

The MK Defendants counter that the Bankruptcy Court's "core factual findings" are not clearly erroneous and devote thirty-four (34) pages to defending the Bankruptcy Court's factual findings.  (CV ECF No. 42 at 17-51.)  Both the Trustee and the MK Defendants organize their factual arguments using the same headings: (1) The MK Defendants' Role; (2) The MK Defendants' Knowledge of the Fraud; (3) Control of IBG; (4) IBG's Knowledge of the Fraud; and (5) Other Findings.  (*See* CV ECF Nos. 17 at 68-79; 42 at 18-51.)

The Trustee counters that the MK Defendants' "deliberate choice" to "not contest or refute significant portions of the Trustee's facts and arguments" constitutes "waiver[.]"  (CV ECF No. 52 at 9.)  The Trustee's Reply Brief lists twenty-eight (28) "facts and arguments" allegedly "undisputed" by the MK Defendants.  (*Id.* at 10-14.)

b. <u>Waiver</u>

   i.   *Waiver by the Trustee*

An issue not listed in an appellant's statement of issues pursuant to Federal Rule of Bankruptcy Procedure 8009 (formerly Rule 8006) and not inferable from the other issues listed in the statement of issues is deemed waived and will not be considered on appeal. *Cumbo v. McDow*, No. 2:06CV97, 2006 WL 3692665, at \*2 (E.D. Va. Dec. 12, 2006) (citing *In re Startec Glob. Commc'ns Corp.*, 300 B.R. 244, 249-50 (D. Md. 2003)).

Rule 8009 requires an appellant to properly present issues for appeal. *In re Dunlap*, No. 3:16-CV-00037-RJC, 2017 WL 374915, at \*2 (W.D.N.C. Jan. 25, 2017). Specifically, an appellant must "file with the clerk and serve on the appellee a designation of items to be included in the record on appeal and a statement of the issues to be presented." FED. R. BANKR. P. 8009(a)(1)(A). Here, the Trustee failed to fulfill the requirements of Rule 8009. The Trustee's Statement of Issues identifies seven (7) allegedly erroneous factual findings. (CV ECF No. 7 at 2.) However, the Trustee challenges the seven (7) allegedly erroneous factual findings identified in the Trustee's Statement of Issues as well as the "systemic failure of the Bankruptcy Court to make findings of fact that are supported by the record" in their Opening Brief. (*Id.* at 68.)

Although the Fourth Circuit has not adopted a test for determining whether an issue is inferable, other circuits and district courts in the Fourth Circuit consider an issue to be inferable if it (1) is raised in the bankruptcy court; (2) does not require the court to make independent factual findings; and (3) presents no surprise to the appellee. *See In re Dunlap*, 2017 WL 374915, at \*2 (citing *Cumbo*, 2006 WL 3692665, at \*2). The Trustee's briefed issue – whether all of the Bankruptcy Court's factual findings are clearly erroneous – is not inferable from the issues designated in the Trustee's Statement of Issues. The Trustee challenged factual findings in favor

of the MK Defendants by presenting its own case-in-chief at trial. (AD ECF No. 1058 at 4.) Additionally, reviewing all of the Bankruptcy Court's factual findings would not require this court to make independent factual findings because factual findings are reviewed for clear error rather than *de novo*. *See Dunes Hotel Assocs.*, 245 B.R. at 495.

Nevertheless, challenging all 175 factual findings made by the Bankruptcy Court would present a surprise to the MK Defendants. Before the Trustee filed their Opening Brief disputing all of the Bankruptcy Court's factual findings, the court granted the Trustee's Motion to Enlarge Page Limitations (CV ECF No. 12) in part and permitted the parties to file initial briefs up to 100 pages. (CV ECF No. 15.) However, if the Trustee's Statement of Issues specified that the Trustee intended to challenge all 175 of the Bankruptcy Court's factual findings, the MK Defendants may not have opposed the Trustee's Motion to Enlarge Page Limitations and the court may have been inclined to allow the parties to file initial briefs of up to 135 pages as the Trustee initially requested. (CV ECF No. 13.) The MK Defendants may have also moved for an extension of time if they knew that the Trustee planned to challenge 168 more factual findings than are identified in the Trustee's Statement of Issues. Given the volume of factual findings disputed by the Trustee's Opening Brief, the page and time limitations imposed before the Trustee filed their Opening Brief may have limited the MK Defendants' ability to sufficiently address the 175 factual findings challenged by the Trustee's Opening Brief. As a result, the new issue raised in the Trustee's Opening Brief would present a surprise to the MK Defendants and is not inferable.

As the Trustee's challenge of all of the Bankruptcy Court's factual findings was not included in their Statement of Issues and cannot be inferred from the five (5) issues presented in the Trustee's Statement of Issues, the Trustee waived its challenge of all of the Bankruptcy Court's

factual findings. Therefore, the court will only consider whether the seven (7) allegedly erroneous factual findings identified in the Trustee's Statement of Issues are clearly erroneous.

ii.    *Waiver by the MK Defendants*

The MK Defendants' "deliberate choice" to "not contest or refute significant portions of the Trustee's facts and arguments" does not constitute waiver as the Trustee alleges. (CV ECF No. 52 at 9.) Forfeiture is "the failure to make the timely assertion of a right" while waiver is the "intentional relinquishment or abandonment of a known right." *Olano*, 507 U.S. at 733. In this case, the MK Defendants have neither forfeited nor waived their challenge to the findings of fact alleged to be erroneous by the Trustee.

In the Fourth Circuit, "an appellee's wholesale failure to respond to a conspicuous, nonfrivolous argument in the appellant's brief ordinarily constitutes a forfeiture." *W. Virginia Coal Workers' Pneumoconiosis Fund v. Bell*, 781 F. App'x. 214, 226 (4th Cir. 2019). Here, the MK Defendants responded to all of the Trustee's conspicuous arguments. The MK Defendants' Response Brief advances five (5) arguments directly responsive to the issues raised in the Trustee's Statement of Issues and Opening Brief. (*Compare* CV ECF No. 42 at 3-4, *with* CV ECF Nos. 7 at 1-5; 17 at 3-4, 14-18.) The Response Brief also devotes thirty-four (34) pages to a section entitled "The Trial Court's 'Core Factual Findings' Are Not Clearly Erroneous" that "address[es] the Trustee's argument that certain 'core factual findings' are clearly erroneous" and is organized by the same headings the Trustee used in the factual findings section of their Opening Brief. (CV ECF Nos. 17 at 68-77; 42 at 17-51.) Given that the MK Defendants devoted almost forty (40) percent of their brief to the factual findings challenged by the Trustee, one of just five (5) issues on appeal, they cannot be faulted for failing to directly respond to twenty-eight (28) inconspicuous "facts and arguments" that the Trustee failed to designate as issues on appeal.

18

Additionally, there is no evidence in the record demonstrating that the MK Defendants intended to relinquish their ability to respond to the Trustee's arguments. In fact, the thirty-four (34) pages the MK Defendants committed in their Response Brief to refuting the Trustee's factual error arguments show that the MK Defendants did not intend to abandon their challenge. (CV ECF No. 42 at 17-51.) As the MK Defendants did not waive or forfeit their challenge to the Trustee's factual error arguments, the court will consider the propriety of the Bankruptcy Court's "core factual findings" on the merits.

c. Analysis

The court reviews the Bankruptcy Court's factual determinations for clear error. *Dunes Hotel Assocs.*, 245 B.R. at 495. Clearly erroneous review "is properly focused upon fact-finding processes rather than directly upon fact-finding results." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 379 (4th Cir. 1995) (citing *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983)). "The appellate function is to insure that the process shall have been principled; the function is not authoritatively to find the 'facts' first instance, or to affirm or deny that the facts 'found' by the trial court are the 'actual' facts of the case." *Miller*, 720 F.2d at 361. If the trial court's "account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.*

The trial on the merits should be the "main event" rather than a "tryout on the road." *June Med. Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2128 (2020) (citing *Anderson*, 470 U.S. at 575). "The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate

the role of the lower court." *Anderson*, 470 U.S. at 573. "In cases in which a [trial court's] factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." *Helton v. AT&T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013).

In this case, the record does not suggest that any of the seven (7) challenged "core factual findings" by the Bankruptcy Court are clearly erroneous.

i.   *"[T]he [MK Defendants] did not cause [IBG] to implement or continue utilizing the fraudulent accounting practices that led to IBG's demise"*

The Trustee contends that the Bankruptcy Court erred in finding that the MK Defendants did not cause IBG to implement or continue utilizing the Accounting Practice. (CV ECF No. 17 at 15.) They assert that the factual finding fails to account for evidence demonstrating that the MK Defendants reviewed IBG's accounting policies, directed the restatement of financial policies, drafted financial documents, communicated with investors, and failed to change the Accounting Practice. (*Id.* at 68-72.) The court disagrees.

The Bankruptcy Court's finding that the Accounting Practice's "use was dependent upon and perpetuated by both CEO Sturgill and [IBG]'s auditor, Grafton" is well-supported by the record. (AD ECF No. 1058 at 105.) Before Hargrett became CFO in September 2006, Sturgill prepared IBG's financial statements. (CV ECF No. 45 at 58-59.) Accordingly, the 2005 balance sheet, the first set of financial statements in the record including an increased accounts receivable figure, originated from Sturgill. (CV ECF No. 19 at 97, 99.) Grafton facilitated IBG's use of the Accounting Practice by issuing an unqualified audit opinion that IBG's financials were prepared in conformity with GAAP each year from 2003 to 2008. (CV ECF No. 44 at 1, 2, 10, 20, 33, 48, 62.)

In contrast, the record reveals that the MK Defendants did not have the authority to cause IBG to implement and utilize the Accounting Practice. IBG hired the MK Defendants to raise capital. The 2006 Contract appointed Morgan Keegan as IBG's "exclusive placement agent[.]" (CV ECF No. 39 at 177-83.) When asked to explain the purpose of the 2006 Contract, Calvin Clark ("Clark"), a Morgan Keegan associate who worked on the engagement, testified that the engagement between IBG and Morgan Keegan was specifically limited to serving as "a broker between [IBG] and ultimately an institutional investor to raise capital." (CV ECF No. 43 at 114.) IBG similarly retained Morgan Keegan to facilitate investment transactions under the 2008 Contract. The 2008 Contract engaged Morgan Keegan as "exclusive financial advisor to [IBG] with respect to a possible mezzanine debt financing[.]" (CV ECF No. 32 at 11.)

Although IBG hired the MK Defendants for their financial expertise, IBG did not hire them to audit the company's financials or implement accounting practices. The 2006 Contract and the 2008 Contract do not mention auditing services. (*See* CV ECF Nos. 32 at 11-14; 39 at 177-83.) Clark also testified that IBG did not engage Morgan Keegan to "review the accounting principles of the company." (CV ECF No. 43 at 112.) Instead, "[a]s an investment bank, [Morgan Keegan was] engaged to execute a transaction" and therefore it "rel[ied] upon the company prepared financials, as well as the audited financials to provide information to investors." (*Id.*) Meyers similarly testified that there was no discussion or commitment by Morgan Keegan to undertake a "deep dive" into IBG's financials. (*Id.* at 154-55.)

In fact, both the 2006 Contract and the 2008 Contract obligated IBG to provide the MK Defendants with accurate and complete financial information. The 2006 Contract provided that IBG "w[ould] furnish Morgan Keegan with such information . . . including financial statements, with respect to the business, operations, assets and liabilities of [IBG] as Morgan Keegan may

reasonably request" and that "Morgan Keegan may rely upon the accuracy and completeness of the Information without independent verification." (CV ECF No. 39 at 178.) Moreover, the 2008 Contract states that IBG "agrees to provide Morgan Keegan all financial and other information requested by Morgan Keegan for the purpose of its engagement hereunder." (CV ECF No. 32 at 12.)

Given IBG's duty to provide the MK Defendants with accurate financial information, the MK Defendants reviewed IBG's finances in order to discuss them with potential institutional investors but were not involved in the formulation or application of the company's accounting practices. In 2006, the MK Defendants prepared a Confidential Information Memorandum ("2006 CIM") summarizing IBG's financial state in a standard format used by private equity firms contemplating investments. (*Id.* at 177.) Although the 2006 CIM included financial information tainted by the Accounting Practice, the MK Defendants did not generate the financial information contained in the document. (CV ECF No. 18 at 374-75.) Meyers testified that the information in the 2006 CIM "is all the company's information" and that the MK Defendants did not "audit the information." (CV ECF No. 43 at 161.) Likewise, Clark testified that he received the data used to develop the profit models in the 2006 CIM from "the management team." (*Id.* at 118-19.)

When assessing the origin of corrupt financials in the 2006 CIM, the Bankruptcy Court noted:

> The record reflects that Blevins testified that he believed Meyers created or introduced the Accounting Practice and that Sturgill was not educated enough to create such a policy. However, the Court had serious doubts about the veracity of Blevins's testimony due to his pre-trial communications with the attorneys on both sides in this matter in which he appears to be "shopping" his testimony to each side in this matter by suggesting to offer testimony to benefit whichever side would benefit him. Further, there were discrepancies between Blevins's testimony and the evidence presented. For example, Blevins testified that he never received communication of the findings of the TS Report or that [IBG]'s financial statements were misstated; however, documentary evidence indicated that he was included in

> the discussions regarding the use of and change from the Accounting Practice after the release of the TS Report . . . As such, the Court does not find Blevins' testimony to be credible.
>
> During the trial, the Court also received testimony from others that Wade Cordell had told investors of [IBG] that Meyers was "working the financials." However, the evidence indicated that Wade Cordell had a tendency to hyperbolize and misrepresent facts to investors, and he, in fact, testified at trial that he believed Sturgill with Grafton provided the financial information that first used the Accounting Practice for the April 2006 CIM and that Sturgill "put this whole system together of . . . how you book accounts receivables . . ." The evidence presented lacked the necessary specificity to convince the Court that Meyers created or introduced the Accounting Practice to [IBG].

(AD ECF No. 1058 at 107 n.71.)  Because the Bankruptcy Court's findings as to the source of the fraudulent financial information in the 2006 CIM rely on the Bankruptcy Court's assessment of witness credibility, "such findings are entitled to even greater deference." *Helton*, 709 F.3d at 351.

 After the MK Defendants drafted the 2006 CIM, IBG's outside securities counsel advised the company that it should conduct a rescission offering to address certain securities laws violations from prior offerings.  (CV ECF No. 43 at 132-33.)  To "speed up the process," the MK Defendants agreed to help IBG's outside securities counsel draft a recission offer.  (*Id.*)  However, they did nothing more than provide outside securities counsel with information that was largely "dropped in" or "cut and paste" from the 2006 CIM and financial information previously provided by IBG's management.  (*Id.* at 139, 142, 191; CV ECF No. 21 at 140.)  Ultimately, IBG's outside securities counsel controlled the rescission offer and its contents.  (CV ECF Nos. 43 at 137, 192; 44 at 230.)

Furthermore, the record shows that the MK Defendants were not involved in the selection of IBG's accounting service providers or in the auditing of IBG's financials.  IBG hired Grafton to audit its financial statements three (3) years before IBG engaged Morgan Keegan's services.  (CV ECF No. 44 at 2.)  IBG later consulted with Ernst & Young ("E&Y") in 2006 about its

accounting practices without the MK Defendants' knowledge. Emails between Blevins and Sturgill establish that IBG sought E&Y's services to address "the accounting issues" while Meyers testified that he did not know that IBG "had been in conversation with E&Y[.]" (CV ECF Nos. 43 at 219-20; 44 at 78, 83, 88.)

The Bankruptcy Court's finding that the MK Defendants did not cause IBG to implement or continue utilizing the Accounting Practice is also supported by Meyers' desire to change the Accounting Practice. Evidence in the record shows that on or around November 2006, Meyers conducted an exit interview with IBG's management in which he recommended that IBG "get a new audit firm" and "go to the most conservative accounting possible." (CV ECF Nos. 43 at 197-98; 44 at 91.) Additionally, Hargrett stated at his deposition that Meyers supported his attempts to change the Accounting Practice and that Meyers thought there was "a better way" of recognizing accounts receivable. (CV ECF No. 45 at 71-72.)

Given the significant evidence in the record supporting the Bankruptcy Court's finding that the MK Defendants did not cause IBG to implement or use the Accounting Practice, the court cannot conclude that the Bankruptcy Court committed clear error. Although a different factfinder may have come to a contrary conclusion from that reached by the Bankruptcy Court in this case, the "rigorous" clear error standard requires more than a party's simple disagreement with the court's findings. *PCS Nitrogen, Inc. v. Ashley II of Charleston, LLC*, 714 F.3d 161, 174-75 (4th Cir. 2013).

ii.      *"[T]he MK Defendants were unaware or had insufficient knowledge of red flags and other indicia that the fraudulent accounting practices they helped create and perpetuate violated [GAAP] at the outset"*

In May 2008, Morgan Keegan Strategic Fund, L.P. ("MKSF"), a private equity firm, expressed interest in a possible mezzanine financing deal with IBG and provided a preliminary

term sheet for $6 million in growth and working capital.  (CV ECF Nos. 43 at 215; 44 at 183.)

MKSF retained Transaction Services, LLC ("TS") to conduct independent financial due diligence

on IBG.  (CV ECF No. 43 at 47.)  On July 1, 2008, TS issued a Financial Due Diligence Report

on IBG ("TS Report") to MKSF.  (CV ECF No. 33 at 53.)  The TS Report concluded that IBG's

"audited financial statements are materially misstated, and should not be relied upon due to the

material overstatement of revenue, net income, and accounts receivable."  (*Id.* at 81.)  In making

this assessment, the TS Report noted that "GAAP requires that contingent fee revenue recognition

begin upon the collection of funds on behalf of customers."  (*Id.* at 62.)

The Bankruptcy Court concluded that the "uncontradicted testimony of Meyers at trial

indicated that he first learned that the Accounting Practice was not GAAP compliant on July 1,

2008 when the TS Report was issued to [IBG]."  (AD ECF No. 1058 at 52.)  The Trustee challenges

this finding, claiming that it is unsupported by the record.  (CV ECF No. 17 at 73-75.)  Specifically,

the Trustee claims that Meyers should have known that the Accounting Practice was improper

based on Sturgill's explanations for the practice and Meyers' own knowledge of accounting.  (*Id.*)

Additionally, the Trustee asserts that the Bankruptcy Court failed to consider evidence in the

record that "[l]anding a deal the size of IBG . . . would provide a needed and desired boost to

[Meyers' and Clark's] career prospects and bank accounts."  (*Id.* at 74.)

Upon review of the record, the court cannot conclude that the Bankruptcy Court's finding

as to the MK Defendants' knowledge of the impropriety of the Accounting Practice is clearly

erroneous.  Instead, the record contains significant evidence supporting the Bankruptcy Court's

assessment.

When asked when was the "first time that [he] learned that IBG's financial statements may

not be GAAP-compliant" at trial, Meyers responded "in 2008 when we were given a copy of the

Transaction Services report." (CV ECF No. 43 at 202.) He then added that "prior to that time," he did not "have any information to indicate that IBG's financial statements may not be [in accordance with] GAAP[.]" (*Id.*) The Bankruptcy Court found Meyers' testimony to be credible because multiple "factors reasonably explain how Meyers could have been unaware of the alleged impropriety with the Accounting Practice, despite being aware of its use." (AD ECF No. 1058 at 108.)

The Bankruptcy Court first noted that Meyers "relied on the repeated assurances of Sturgill and Grafton that the Accounting Practice was proper" and that IBG "had several professionals working for it that did not question the practice, and therefore, provided additional legitimacy for its use." (*Id.* at 107-08.) IBG's management did in fact provide multiple assurances that the Accounting Practice was GAAP-compliant. Meyers testified that "the CEO and acting CFO indicated to me emphatically that Grafton and Company, their auditors, had signed off on it, and he acknowledged that he believed it was GAAP." (CV ECF No. 43 at 222-23.) He also testified that IBG's management repeatedly confirmed that the Accounting Practice complied with GAAP. (*Id.* at 209.) Prior to the 2008 Contract, Hargrett continued to assert that IBG's accounting policies were GAAP-compliant. (*Id.*)

Second, the Bankruptcy Court highlighted that Meyer's knowledge of a similar accounting practice utilized by other debt collection companies led him to believe that the Accounting Practice complied with GAAP. (AD ECF No. 1058 at 19, 107-08.) At trial, Meyers testified that his "rudimentary" knowledge about the effective yield method of accounting led him to believe that there was "some basis behind [the Accounting Practice.]" (CV ECF No. 43 at 170-71.)

Third, the Bankruptcy Court observed that Meyers' misunderstanding of the Account Practice was understandable because "Meyers' experience while he was an accountant was limited

26

to the accounting of manufacturing businesses and not the accounting of debt collections businesses." (ADE ECF No. 1058 at 108.)

Finally, the Bankruptcy Court emphasized that "[u]nder neither the 2006 Contract nor the 2008 Contract were Meyers and Morgan Keegan retained to conduct an audit or provide accounting services to [IBG]." (AD ECF No. 1058 at 109.) In fact, "[p]ursuant to the express terms of the 2006 Contract, Morgan Keegan had no duty to verify the financial information provided to it by [IBG]." (*Id.*) Instead, IBG "had a duty to provide accurate information to Morgan Keegan." (*Id.*) Both the documentary and testimony evidence in the record support the Bankruptcy Court's conclusion. *See supra* pp. 18-19.

Here, the Bankruptcy Court's finding that the MK Defendants did not know the Accounting Practice was improper is well supported by the record. As a result, the finding is not in error.

> iii.    *"[T]he MK Defendants did not conceal the fraudulent nature of the accounting practice from IBG's innocent directors and management, investors, and potential investors"*

The Bankruptcy Court rejected the Trustee's assertion that the MK Defendants colluded to create the Accounting Practice to conceal IBG's true financial state and instead found that the MK Defendants did not "act[] deceptively to hide the Accounting Practice." (AD ECF No. 1058 at 4, 106 n.68.) Specifically, the Bankruptcy Court found that "far from hiding its use, the Accounting Practice was openly discussed by Meyers and Morgan Keegan with [IBG]'s management and the institutional investors it consulted. The evidence is uncontradicted that Meyers insisted on transparency regarding the Accounting Practice with the institutional investors he brought to [IBG]." (*Id.* at 109.) This finding is supported by substantial evidence in the record.

The record reveals that accounting transparency was in the MK Defendants' best interests. Meyers testified that his "goal is to have as much disclosure as possible" because if private equity

firms discover an accounting irregularity, "they ask . . . questions and then I've got to answer the question ten times."  (CV ECF No. 43 at 173.)

The evidence also shows that Meyers promoted disclosure of the Accounting Practice. During the 2006 Contract, Meyers advised Sturgill to explain and justify the Accounting Practice to potential investors.  (*Id.* at 172.)  Meyers and Clark also discussed the revenue recognition policy extensively, including the collections rate and other figures supporting the accounts receivables figures, with a potential investor, Bison Capital, in the summer of 2006.  (*Id.* at 184-85; CV ECF No. 45 at 40-42.)  Meyers continued his practice of full disclosure during the 2008 Contract. Meyers testified that at the beginning of the 2008 Contract, he encouraged IBG to proactively address the Accounting Practice with potential investors.  (CV ECF No. 43 at 211-12.)  To facilitate disclosure of the Accounting Practice, Meyers helped Hargrett draft an explanatory document describing the accounting practice and IBG's intent to write off the receivables balance. (*Id.*; CV ECF No. 44 at 178-82.)

The Bankruptcy Court also correctly rejected the Trustee's suggestion that "Clark's calculation of [IBG]'s collection rate as part of his work on the due diligence requests of Bison was an effort to conceal the Accounting Practice."  (AD ECF No. 1058 at 106 n.70.)  Although Clark's methodology for calculating the collection rate ultimately proved flawed, Clark was transparent with IBG's management and Bison about his methodology.  (CV ECF Nos. 21 at 103; 43 at 130.)  On July 26, 2006, Calvin sent an email to Bison and IBG management explaining his methodology for calculating the collection rate and providing the raw data he used to calculate the collection rate.  (CV ECF No. 21 at 103.)  And as the Bankruptcy Court noted, there is no evidence in the record showing that any member of management or the Board expressed concerns with Clark's methodology.  (AD ECF No. 1058 at 106 n.70.)

As the record supports the Bankruptcy Court's finding that the MK Defendants did not conceal the Accounting Practice, the court concludes that the finding is not clearly erroneous.

iv.    *"[T]he MK Defendants did not knowingly and substantially participate in or encourage the Management Defendants' breaches of fiduciary duty to IBG"*

Under Nevada law,[4] aiding and abetting a breach of a fiduciary duty has four required elements: (1) a fiduciary relationship between two parties; (2) breach of the fiduciary relationship; (3) the defendant knowingly and substantially participated in or encouraged the breach of fiduciary duty; and (4) the plaintiff suffered damage as a result of the breach. *Guilfoyle v. Olde Monmouth Stock Transfer Co., Inc.*, 335 P.3d 190, 198 (Nev. 2014).  Whether "the defendant third party knowingly and substantially participated in or encouraged that breach" is a question for the trier of fact and thus subject to review for clear error. *Id.* (granting summary judgment on aiding and abetting a breach of a fiduciary duty claim because plaintiff failed to present evidence that defendant "knowingly and substantially participated in or encouraged that breach").

At trial, the Trustee alleged that the MK Defendants aided and abetted the breach of the Management Defendants' fiduciary duties, claiming that "the Management Defendants, with the assistance of Meyers and Morgan Keegan, looted [IBG] and used capital raised by [IBG] through the use of the Accounting Practice for their own personal benefit."  (AD ECF No. 1058 at 75.) After "weighing the evidence presented[,]" the Bankruptcy Court concluded that "the Trustee has not met [their] burden of proof to establish that Meyers and Morgan Keegan 'knowingly and

---

[4] The Bankruptcy Court determined that South Carolina law applies to the breach of fiduciary duty and fraud causes of action and that Nevada law applies to the aiding and abetting a breach of fiduciary duty cause of action.  (AD ECF No. 1058 at 73.)  As to the federal securities fraud cause of action, the Bankruptcy Court found that federal law applies but that South Carolina law "governs the issue regarding the imputation of the knowledge and conduct of [IBG]'s agents to [IBG]."  (*Id.*)

substantially participated in or encouraged' the Management Defendants' breach of their fiduciary duties." (*Id.* at 128.)

The Trustee contends that the Bankruptcy Court's finding is not supported by the record because the MK Defendants created an "informational vacuum" that allowed the Management Defendants to implement and use the Accounting Practice. (CV ECF No. 17 at 80-81.) In addition, the Trustee claims that the Bankruptcy Court failed to consider that "Meyers' bonus-heavy compensation structure incentivized him to . . . work in tandem with [IBG's] faithless fiduciaries." (*Id.* at 81.)

The evidence presented at trial suggests the MK Defendants did not (1) knowingly participate in the Management Defendants' breach or (2) substantially participate in the breach. First, the record shows the MK Defendants did not know that the Accounting Practice was fraudulent or that the Management Defendants were misappropriating company assets. The Bankruptcy Court properly concluded the MK Defendants were unaware of the impropriety of the Accounting Practice until the release of the TS Report. *See supra* pp. 22-25; (AD ECF No. 1058 at 52.) The Trustee also does not challenge the Bankruptcy Court's finding that "the evidence does not demonstrate that Meyers and Morgan Keegan were aware of any alleged misappropriation of [IBG]'s assets by Management Defendants." (*See* CV ECF No. 17; AD ECF No. 1058 at 112.) Accordingly, the MK Defendants could not have "knowingly" participated in or encouraged the Management Defendants' alleged breaches of their fiduciary duties: implementing the Accounting Practice and misappropriating company funds.

Second, the record does not demonstrate the MK Defendants "substantially" participated in the Management Defendants' breach. The evidence does not suggest the MK Defendants caused IBG to implement or use the Accounting Practice. *See supra* pp. 18-22. Instead, it shows the

Accounting Practice's use was dependent upon and perpetuated by both Sturgill and Grafton.  *Id.* Additionally, the record demonstrates the MK Defendants did not create an "informational vacuum" around the Accounting Practice.  *See supra* pp. 25-26.  Far from hiding IBG's use of the Accounting Practice, Meyers raised questions about the practice and required full disclosure of the practice to institutional investors.  (*See, e.g.*, CV ECF Nos. 43 at 172, 184-85, 211-12; 44 at 178-82; 45 at 40-42.)  Moreover, the record shows IBG had knowledge of the Accounting Practice independent of the MK Defendants' involvement.  For example, Sturgill directed Wade Cordell, Hargrett, Blevins, and Brad Cordell on July 21, 2008 to "stop talking about [IBG's] auditors and GAAP" because "[w]e don't need to be talking about possible legal issues or concerns that revolve around the [accounts receivable.]"  (CV ECF No. 44 at 187.)  Wade Cordell, Van Hoeven, and Hargrett also testified they knew IBG used the Accounting Practice.  (AD ECF No. 1058 at 82.)

Furthermore, the Bankruptcy Court did not commit clear error by interpreting Meyers' compensation structure differently than the Trustee.  One interpretation of Meyers' "bonus-heavy compensation structure" is that it "incentivized him to . . . work in tandem with [IBG's] faithless fiduciaries."  (CV ECF No. 17 at 81.)  However, as the Bankruptcy Court concluded, another interpretation of Meyers' compensation structure is that "it seems counterintuitive that Meyers and Morgan Keegan would risk their reputations and jobs to knowingly promote the use of an improper Accounting Practice in dealing with sophisticated institutional investors who were certain to undertake their own due diligence reviews, including financial reviews, and likely discover the improper practice."  (AD ECF No. 1058 at 110.)  "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson*, 470 U.S. at 574.

In sum, the testimony and documentary evidence submitted at trial support the Bankruptcy Court's finding that "the Trustee has not met [their] burden of proof to establish that Meyers and Morgan Keegan 'knowingly and substantially participated in or encouraged' the Management Defendants' breach of their fiduciary duties." (AD ECF No. 1058 at 128.) Consequently, the finding is not clearly erroneous.

> v.    "[T]he MK Defendants did not breach their fiduciary duties and duty to disclose to IBG"

To establish a claim for breach of fiduciary duty under South Carolina law, a plaintiff must prove (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages proximately resulting from the wrongful conduct of the defendant. *RFT Mgmt. Co., L.L.C. v. Tinsley & Adams L.L.P.*, 732 S.E.2d 166, 173 (S.C. 2012). While the existence of a fiduciary duty is a question of law, breach of a fiduciary duty is a question of fact reviewed for clear error. *See Spence v. Wingate*, 716 S.E.2d 920, 928 (S.C. 2011); *Moore v. Moore*, 599 S.E.2d 467, 473 (S.C. Ct. App. 2004).

Although the Bankruptcy Court found the MK Defendants did not owe IBG a fiduciary duty, it determined:

> [E]ven if Meyers and Morgan Keegan were fiduciaries of [IBG] in regard to its financial statements and accounting policies, the Trustee has not satisfied his burden of establishing a breach when considering Meyers and Morgan Keegan's efforts to advise [IBG]'s management of potential issues regarding the Accounting Practice, its openness to institutional investors about the Accounting Practice, and its support of Hargrett's efforts to change the practice.

(AD ECF No. 1058 at 130.) The Trustee counters that the "MK Defendants breached their fiduciary duties" because their "knowing development and concealment of IBG's fraudulent accounting policy is the antithesis of good faith, loyalty, due care, and fair dealing." (CV ECF No. 17 at 84, 86.)

Here, the Trustee has failed to demonstrate the Bankruptcy Court's finding on the element of breach is clearly erroneous. The Bankruptcy Court identified several determinative facts supporting its conclusion that no breach occurred. (AD ECF No. 1058 at 130.) First, it noted the MK Defendants' "efforts to advise [IBG]'s management of potential issues regarding the Accounting Practice[.]" (*Id.*) Evidence in the record shows on or around November 2006, Meyers conducted an exit interview with IBG's management in which he recommended that IBG "get a new audit firm" and "go to the most conservative accounting possible." (CV ECF No. 43 at 197-98; 44 at 91.) Second, the Bankruptcy Court emphasized the MK Defendants' "openness to institutional investors about the Accounting Practice[.]" (AD ECF No. 1058 at 130.) The record not only demonstrates Meyers and Clark discussed IBG's revenue recognition policy with Bison extensively, but it also shows Meyers helped Hargrett draft an explanatory document describing the accounting practice and IBG's intent to write off the receivables balance for potential institutional investors. (CV ECF Nos. 43 at 184-85, 211-12; 44 at 178-82; 45 at 40-42.) Finally, the Bankruptcy Court noted the MK Defendants' "support of Hargrett's efforts to change the practice." (AD ECF No. 1058 at 130.) Hargrett's deposition testimony reinforces this finding. During his deposition, Hargrett stated that Meyers supported his attempts to change the Accounting Practice and that Meyers thought there was "a better way" of recognizing accounts receivable. (CV ECF No. 45 at 71-72.)

In contrast, the Trustee's arguments are unsupported by the record. The evidence presented at trial demonstrates the MK Defendants did not know the Accounting Practice was fraudulent, implement the Accounting Practice, or conceal the impropriety of the Account Practice. *See supra* pp. 18-26. Accordingly, the court concludes the Bankruptcy Court did not clearly err in finding the MK Defendants did not breach their fiduciary duties.

     *vi.*     *"IBG's innocent directors and management did not participate in the day to day operation and management of IBG, and they lacked the ability to control the Company"*

In regards to IBG's operations, the Bankruptcy Court concluded "the Management Defendants controlled both the day-to-day and long-term aspects of [IBG]'s business" and the "[N]on-[D]efendant [D]irectors did not have involvement in the day-to-day operations of [IBG]." (AD ECF No. 1058 at 9.)  However, it acknowledged Van Hoeven had a larger role in IBG's activities than the other Non-Defendant Directors, stating "[u]ntil September of 2006, Van Hoeven managed [IBG]'s Processing Center located in Jacksonville, Florida.  In addition, [IBG] employed Van Hoeven in various capacities, including the Director of Information and Technology.  In addition, he assisted with [IBG]'s capital raises from individual investors." (*Id.* at 8.)

The Trustee asserts the Bankruptcy Court's findings as to the management of IBG's daily operations are unsupported by the record.  (CV ECF No. 17 at 58.)  They maintain the "board members' roles were not those of 'passive overseers' but instead active governing directors from whose [sic] 'ideas, vision, insight and wisdom' were received during meetings." (CV ECF No. 17 at 59.)

The court finds the Trustee's challenge is without merit.  In addition to serving on IBG's Board, Sturgill served as CEO, Wade Cordell served as President, Bard Cordell served as COO, and Blevins served as General Counsel.  (AD ECF No. 788 at 6-7.)  Hargrett was not a member of the Board but served as CFO.  (*Id.* at 7; CV ECF No. 45 at 68.)  Given the Management Defendants' roles as corporate executives, they were responsible for the company's principal business activities, including sales, compliance, capital raises, presentations to the Board, and preparing the company's financial statements.  (*See, e.g.*, CV ECF Nos. 34 at 143-44; 43 at 110; 44 at 92, 168; 45 at 51, 59.)

In contrast to the Management Defendants, Handy and Potter did not hold corporate executive positions at IBG. Both Handy and Potter were only affiliated with IBG in their capacities as members of the Board. (AD ECF No. 788 at 7.) The record demonstrates that Handy and Potter had little influence over IBG's operations as members of the Board. Handy testified that it was difficult for him to effect change in IBG's operations because he did not "know how many allies of action [he] would have had on the board[.]" (CV ECF No. 18 at 231.) Wade Cordell also testified at trial that Potter "didn't participate very much at all" and "pretty much voted however [Sturgill] wanted to vote, on pretty much everything." (CV ECF No. 43 at 102.)

Unlike Handy and Potter, Van Hoeven served in various capacities at IBG from 2004 until 2010. (*Id.*) In addition to serving as a member of the Board, he served as Processing Center Director, Vice President of Electronic Processing, and Vice President of Product and Technology Development. (*Id.* at 7-8.) However, the record shows Van Hoeven was primarily involved in IBG's processing operations. In his various roles, Van Hoeven's "job [was] to run [IBG's processing] facility and to process the checks from the merchants that the marketing company would bring on." (CV ECF No. 18 at 17.) He did not oversee the company's finances, compliance obligations, or sales efforts like the Management Defendants. (*Id.* at 17, 65.) In fact, Van Hoeven testified at trial that he "lost control" of customer payments and that customer payments were "completely controlled by Mr. Cordell[.]" (CV ECF No. 43 at 30-31.) The record also suggests Van Hoeven was only occasionally involved in soliciting new investors because of his intimate knowledge of IBG's processing operations. (*Id.* at 16-18.) Thus, while it could be said that Van Hoeven was involved in the IBG's day-to-day processing operations, it could not be said that Van Hoeven was involved in IBG's day-to-day corporate operations.

35

After a thorough review of the record, the court finds that the Bankruptcy Court's finding that the "[N]on-[D]efendant [D]irectors did not have involvement in the day-to-day operations of [IBG]" but that "Van Hoeven managed [IBG]'s Processing Center . . . [and] assisted with [IBG]'s capital raises from individual investors" is not clearly erroneous.  (AD ECF No. 1058 at 8-9.) Although the Trustee challenges the Bankruptcy Court's interpretation of the record, the Bankruptcy Court's "account of the evidence is plausible in light of the record viewed in its entirety[.]"  *Anderson*, 470 U.S. at 574 (1985).

> vii.    *"IBG's innocent directors, management, and advisors failed to discharge their duties to the Company and were aware of the fraudulent nature of the accounting practice and the misconduct of the MK Defendants and the Management Defendants"*

In the course of its imputation analysis, the Bankruptcy Court found "that members of, if not the entirety of, [IBG]'s governing body had actual knowledge of the Accounting Practice that they received within the scope of their authority[.]"  (AD ECF No. 1058 at 83.)  This finding is not clearly erroneous.

As the Bankruptcy Court notes, the minutes of the January 2007 IBG Board meeting, discussions between IBG's management about changing the Accounting Practice, and the explanatory note to IBG's audited financial statements show that IBG had knowledge of the Accounting Practice.  (*Id.* at 82-83.)  IBG's Board expressly discussed changing the Accounting Practice at its January 8, 2007 meeting.  Minutes from the meeting state:

> Haines Hargrett then addressed the Board concerning the 2006 financial statements and discussed [sic] ensued regarding changing the way the revenues of the company are booked, i.e. checks in the system waiting for collection.  It was decided unanimously that it is in the Company's best interests to maintain the status quo and not to change the reporting method.

(CV ECF No. 30 at 38.)  At trial, Wade Cordell and Van Hoeven confirmed that the Board discussed the Accounting Practice and unanimously decided "to continue to go on with the way

we were doing it[.]"  (CV ECF No. 43 at 29, 103-04.)  As a result of such evidence, the Bankruptcy Court concluded that "[a]ll members of [IBG]'s Board received and reviewed the company's audited financials and were aware of the growth in [IBG]'s accounts receivable balance."  (AD ECF No. 1058 at 82.)

Discussions between IBG's management about changing the Accounting Practice likewise demonstrate that IBG was aware of the Accounting Practice.  In July 2008, Sturgill directed Wade Cordell, Hargrett, Blevins, and Brad Cordell to "stop talking about [IBG's] auditors and GAAP" because "[w]e don't need to be talking about possible legal issues or concerns that revolve around the [accounts receivable.]"  (CV ECF No. 44 at 187.)

Finally, the explanatory note to IBG's audited financial statements illustrates that IBG had actual knowledge of the Accounting Practice.  From 2004 to 2008, IBG's historic audited financial statements included an explanatory note stating that the company's account receivable balance includes state-mandated fees and that IBG is "actively collecting that amount."  (CV ECF Nos. 25 at 86; 44 at 7, 15, 26, 39, 53, 67.)

As the Bankruptcy Court's finding that members of IBG's governing body had knowledge of the Accounting Practice is well-supported by the record, it is not clearly erroneous.

### 3. Whether the Bankruptcy Court erred as a matter of law by holding that the MK Defendants did not owe IBG a fiduciary duty, a duty of due diligence, or a duty to disclose all known material facts

#### a.  The Bankruptcy Court's Findings

At trial, the Trustee alleged that the MK Defendants "had an expansive overarching role that went beyond the parties' written contracts, including agreements to serve as [IBG]'s underwriter, investment adviser, and producing agent."  (AD ECF No. 1058 at 128-29.)  However, after weighing the evidence, the Bankruptcy Court found that "the Trustee ha[d] not met his burden

of proof that Meyers and Morgan Keegan agreed to serve [IBG] in these expanded capacities."

(*Id.* at 129.)  In making this determination the Bankruptcy Court specially considered

> (1) the provision of the 2006 Contract Morgan Keegan's right to first refusal to serve as [IBG]'s underwriter for a period of six months after the terms of that contact, (2) the relative lack of communication between Meyers and Morgan Keegan and [IBG] between the 2006 Contract and the 2008 Contract, and (3) the nature of the additional actions taken by Meyers, which appeared to be more in line with business courtesies and not evidence of an agreement for Meyers and Morgan Keegan to serve [IBG] in an expanded role.

(AD ECF No. 1058 at 129.)  Given that the MK Defendants did not agree to serve in an expanded capacity, the Bankruptcy Court concluded that IBG's relationship with the MK Defendants was defined by the two (2) written contracts they entered.  (*Id.*)

"Under this framework and weighing the evidence presented," the Bankruptcy Court found that the Trustee failed to establish "the necessary fiduciary relationship between Meyers and Morgan Keegan and [IBG], specifically, in regard to [IBG]'s financial statements and accounting procedures, including the Accounting Practice."  (*Id.*)  The Bankruptcy Court cited "a number of factors" in support of this conclusion, including:

> (1) the express provision in the 2006 Contract that Morgan Keegan may rely on the accuracy of the financial information [IBG] provides it without independent verification, (2) the provision of the April 2006 CIM that others may not rely on Morgan Keegan for the accuracy of the financial information provided in the document, (3) the fact that neither Meyers nor Morgan Keegan had any control over [IBG]'s operations, its accounting policies, or its assets, (4) the fact that [IBG] did not retain Meyers and Morgan Keegan to conduct an audit of or opine on [IBG]'s accounting practices, (5) the fact that [IBG] made all of the decisions with respect to its financial statements and capital raises, and (6) the fact that on the one occasion that Meyers and Morgan Keegan created a lending investment opportunity with MKSF, [IBG]'s management declined to proceed with the investment, electing to raise capital directly on their own.

(*Id.* at 129-30.)

The Bankruptcy Court did not address whether the MK Defendants owed IBG a duty of due diligence.  (*See id.*)  However, the Bankruptcy Court concluded that the MK Defendants did

not owe IBG a duty to disclose.  (*Id.* at 129 n.87.)  The Bankruptcy Court rejected the Trustee's

argument that Meyers owed IBG a duty to disclose because he was a CPA, finding that IBG "did

not retain Meyers and Morgan Keegan to serve as accountants or auditors and had no expectation

of them acting as such[.]"  (*Id.*)

     b.  <u>Analysis</u>

Although the Trustee asserts that this issue is a mixed question of law and fact, it is in

actuality a question of law.  *See Walbeck v. I'On Co., LLC*, 827 S.E.2d 348, 358 (S.C. Ct. App.

2019) (citing *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 714 (S.C. 2003) ("Whether the law

recognizes a particular duty is an issue of law to be decided by the [c]ourt.")).  Accordingly, the

court reviews the issue *de novo*.  *See In re Biondo*, 180 F.3d at 130.  "[B]y definition, *de novo*

review entails consideration of an issue as if it had not been decided previously."  *Stone v.

Instrumentation Lab. Co.*, 591 F.3d 239, 246 (4th Cir. 2009); (citing *United States v. George*, 971

F.2d 1113, 1118 (4th Cir.1992)).

"A confidential or fiduciary relationship exists when one imposes a special confidence in

another, so that the latter, in equity and good conscience, is bound to act in good faith and with

due regard to the interests of the one imposing the confidence."  *Pitts v. Jackson Nat. Life Ins. Co.*,

574 S.E.2d 502, 507 (S.C. Ct. App. 2002) (citing *Island Car Wash, Inc. v. Norris*, 358 S.E.2d 150,

152 (S.C. Ct. App. 1987)).  As a general rule, a fiduciary relationship cannot be created by the

unilateral action of one party.  *Moore v. Moore*, 599 S.E.2d 467, 472 (S.C. Ct. App. 2004).  "To

establish the existence of a fiduciary relationship, the facts and circumstances must indicate the

party reposing trust in another has some foundation for believing the one so entrusted will act not

in his own behalf but in the interest of the party so reposing."  *Id.* (*citing Burwell v. S.C. Nat'l

Bank*, 340 S.E.2d 786, 790 (S.C. 1986)).  The evidence must show the entrusted party actually

accepted or induced the confidence placed in him. *Id.* "Parties in a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when this duty to disclose is triggered, silence may constitute fraud." *Id.* (citing *Ellie, Inc. v. Miccichi*, 594 S.E.2d 485, 497 (S.C. Ct. App. 2004)).

South Carolina courts "have carefully refrained from defining the particular instances of fiduciary relationship in such a manner that other and perhaps new cases might be excluded and have refused to set any bounds to the circumstances out of which a fiduciary relationship may spring." *Island Car Wash*, 358 S.E.2d at 152. Thus, the existence of a fiduciary relationship is based on the "particulars" of the relationship. *Pitts*, 574 S.E.2d at 507.

The Trustee argues that the MK Defendants owed IBG a fiduciary duty because "the record is replete with evidence that the MK Defendants sought, induced, and accepted IBG's trust and confidence." (CV ECF No. 17 at 83.) However, the Trustee fails to identify any evidence in the record or provide a single citation to the record to support this claim. (*See id.* at 82-83.)

When a party has "effectively left to the [court] the unenviable task of poring over [voluminous] pages of . . . exhibits in search of bits of evidence[,]" the court remains "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate." *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 395 (4th Cir. 1994). Here, the record on appeal consists of nearly 6,000 pages. (*See* CV ECF Nos. 18; 19; 20; 21; 22; 23; 24; 25; 26; 27; 28; 29; 30; 31; 32; 33; 34; 35; 36; 37; 38; 39; 40; 41; 43; 44; 45; 46; 47; 48.) Given the depth of the record and the Trustee's failure to direct the court to specific evidence in the record, the court declines to consider the Trustee's argument that "the record is replete with evidence that the MK Defendants sought, induced, and accepted IBG's trust and confidence." (CV ECF No. 17 at 83.)

The Trustee also recycles an argument it presented at trial and contends that the MK Defendants owed IBG a fiduciary duty because they served as IBG's financial advisor, agent, and broker-dealer. (*Id.* at 83-84.) Like the Bankruptcy Court, this court disagrees.

First, the Trustee asserts that the MK Defendants' role as IBG's financial advisor created a fiduciary duty under *Burwell* and *Maybank v. BB&T Corp.*, No. 6:12-cv-00214-JMC, 2012 WL 3157006 (D.S.C. Aug. 3, 2012). (*Id.* at 83.) In *Burwell*, a guarantor of a loan alleged that the bank providing the loan breached its fiduciary duty to him by allowing the loan to be renewed without his knowledge. 340 S.E.2d at 790. The Supreme Court of South Carolina acknowledged that "[i]n limited circumstances . . . a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer as a part of the services the bank offers." 340 S.E.2d at 790. However, it found that no fiduciary relationship existed between the guarantor and the bank because the guarantor did not repose a "special trust" in the bank and "could not reasonably have believed that [the bank's employee] was acting on [the guarantor's] behalf instead of on behalf of [the bank]." *Id.*

In *Maybank*, the court interpreted *Burwell* as standing for the proposition that "a financial institution owes a fiduciary duty to its customer where the institution goes beyond the mere provision of transactional services and actually engages in an advisory role with respect to the customer." 2012 WL 3157006, at *3. It then speculated that it is not "unreasonable to presume that South Carolina state courts may extend this proposition to individual investment or financial advisors who provide advice to a client and not merely the execution of discreet transactions at the direction of the client." *Id.* This court respectfully disagrees with such reasoning.

*Burwell* recognized that a fiduciary relationship may be created between a bank and a customer if the bank undertakes to advise the customer "[i]n limited circumstances[.]" 340 S.E.2d

41

at 790.  But the court only concluded that such limited circumstances did not exist after analyzing

whether "the one reposing the trust has foundation for his belief that the one giving advice or

presenting arguments is acting not in his own behalf, but in the interests of the other party."  *Id.*

Thus, *Burwell* does not stand for the blanket proposition that a financial institution owes a fiduciary

duty to its customer if it provides the customer with advisory services.  Instead, *Burwell* is

consistent with South Carolina's canon of fiduciary duty cases and suggests that the existence of

a fiduciary duty should be determined based on the substance of the relationship rather than the

name of the relationship.  Accordingly, the court will evaluate whether the MK Defendants' role

as IBG's financial advisor led IBG to impose a "special confidence" in the MK Defendants that

bound the MK Defendants to "act in good faith and with due regard" to IBG and its interests.  *Pitts*,

574 S.E.2d at 507.

The record does not demonstrate that the MK Defendants owed IBG a fiduciary duty on

the basis that they served as IBG's financial advisor.  The court notes that the MK Defendants

served as IBG's financial advisor in a narrow capacity.  Only the 2008 Contract explicitly

appointed the MK Defendants as IBG's financial advisor and it specifically engaged the MK

Defendants to serve as IBG's financial advisor on specific mezzanine debt financing transactions.

The 2006 Contract appointed Morgan Keegan to act as IBG's "exclusive placement agent in

connection with the sales of . . . [s]ecurities" such as "common stock . . . convertible debt or other

equity securities"  while the 2008 Contract engaged Morgan Keegan to "act as exclusive financial

advisor to [IBG] with respect to a possible mezzanine debt financing which includes securities

which are modest or non-amortizing debt instruments[.]"  (CV ECF Nos. 32 at 11; 39 at 177.)

Neither contract appointed the MK Defendants to serve as IBG's financial advisor on a range of

financial and business matters.  In fact, the 2006 Contract expressly provided Morgan Keegan with

"a right of first refusal to act as [IBG's] financial advisor in connection with [other financing transactions that occur during the 2006 Contract or within six (6) months thereafter] or as lead managing underwriter or exclusive placement agent in connection with such Financing[.]"  (CV ECF No. 39 at 181.)   As the Bankruptcy Court noted, if IBG and Morgan Keegan "had an overarching agreement for Morgan Keegan to serve as its underwriter or investment adviser, there would have been no need for this right to first refusal in the 2006 Contract."  (AD ECF No. 1058 at 128 n.85.)  IBG's actions also show the MK Defendants only advised IBG on specific financing transactions.  IBG pursued securities offerings, oversaw its operations, managed its own finances, controlled its accounting practices, and developed its own business model without the MK Defendants' assistance.  (CV ECF Nos. 39 at 185; 43 at 15, 20-21, 23-27, 241-42, 255-56; 44 at 2.)

Nevertheless, the MK Defendants' narrow advisory role did not cause IBG to impose a "special confidence" in the MK Defendants that would create a fiduciary relationship.  IBG could not have reasonably believed the MK Defendants would act in IBG's best interests rather than their own.  Both the 2006 and 2008 Contracts provided that Morgan Keegan would only be compensated if it secured an institutional investor for IBG, IBG agreed to the investment, and the deal closed.  (CV ECF Nos. 32 at 12; 39 at 177.)  As a result, Morgan Keegan had an incentive to secure institutional investments even if the investments were not in IBG's best interests.   In addition, the 2008 Contract explicitly noted that Morgan Keegan may hold positions in "other companies which may be the subject of the engagement contemplated by this Agreement."  (CV ECF No. 32 at 13.)  Thus, IBG was on notice the MK Defendants' interests could conflict with IBG's interests.

IBG's lack of "special confidence" in the MK Defendants advisory services is best shown by IBG's decision to reject MKSF's investment. Although Meyers believed "in good faith" IBG should have accepted MKSF's investment offer, IBG rejected the investment because the terms were "too onerous[.]" (CV ECF No. 43 at 215-16.)

IBG's decision to exclude the MK Defendants from certain financial matters also underscores that IBG did not impose a "special confidence" in the MK Defendants. During the 2006 Contract, IBG consulted with E&Y about its accounting practice without the MK Defendants' knowledge. (CV ECF Nos. 43 at 219-20; 44 at 78, 83, 88.) IBG also pursued investments from individuals during the 2006 Contract without the MK Defendants' knowledge. (CV ECF No. 43 at 143-44, 193, 200, 219.)

Thus, IBG did not have a foundation for believing the MK Defendants would act in IBG's best interests or impose a "special confidence" in the MK Defendants as IBG's financial advisor. Accordingly, the MK Defendants did not owe IBG a fiduciary duty as a result of their role as IBG's financial advisor.

Second, the Trustee claims Morgan Keegan's role as IBG's agent establishes a fiduciary duty. (CV ECF No. 17 at 84.) Contrary to the Trustee's assertions, the title "agent" does not automatically create a fiduciary duty. In *Pitts*, the Court of Appeals of South Carolina found that a fiduciary relationship did not exist between a customer and their insurance agent. 574 S.E.2d at 507-09. Rather than assume a fiduciary relationship existed on the basis of the title "agent," the court analyzed the "particulars" of the relationship to determine whether a fiduciary duty was created. *Id.* Thus, the court will assess the particulars of IBG's agency relationship with the MK Defendants to determine if a fiduciary relationship existed.

The court observes the MK Defendants only served as IBG's agent in a limited capacity. Only the 2006 Contract appointed Morgan Keegan as IBG's agent. While the 2008 Contract does not even contain the word "agent," the 2006 Contract engages Morgan Keegan as IBG's "exclusive placement agent" in connection with the sale of certain securities. (CV ECF Nos. 32 at 11-14; 39 at 177.) The Trustee does not cite to any other evidence in the record to establish an agency relationship between the MK Defendants and IBG. (*See* CV ECF No. 17 at 84.) Standing alone, the 2006 Contract's use of the word "agent" did not create a fiduciary relationship between the MK Defendants and IBG. Once again, the record shows IBG did not impose a "special confidence" in the MK Defendants or reasonably believe the MK Defendants' were acting solely in IBG's interests. *See supra* pp. 43-44.

Third, the Trustee maintains that the MK Defendants had a fiduciary relationship with IBG based on its role as IBG's broker-dealer. (CV ECF No. 17 at 84.) Not only does the Trustee fail to define "broker-dealer," but the Trustee also fails to cite case law from any jurisdiction establishing that broker-dealers owe fiduciary duties. (*See id.*) South Carolina Code § 35-1-102 (2020) defines a "broker-dealer" as "a person engaged in the business of effecting transactions in securities for the account of others or for the person's own account." However, the term does not include "an agent[.]" *Id.* An agent is an individual who "represents an issuer in effecting or attempting to effect purchases or sales of the issuer's securities." *Id.* Here, the MK Defendants appear to have served as IBG's "agent" rather than IBG's "broker-dealer." The 2006 Contract engaged the MK Defendants as IBG's "exclusive placement agent" for certain securities rather than as IBG's "broker-dealer." (CV ECF No. 39 at 177.) The MK Defendants' responsibilities under both the 2006 and 2008 Contracts also required the MK Defendants to represent IBG in effecting the sale of IBG securities. (*See* CV ECF Nos. 32 at 11-14; 39 at 177-83.) As a result,

the court finds the MK Defendants did not serve as IBG's "broker-dealer" under South Carolina law. Thus, the court will not consider whether the alleged broker-dealer relationship created a fiduciary relationship.

After a *de novo* review of the record, the court finds the MK Defendants did not owe IBG a fiduciary duty. Accordingly, the court affirms the Bankruptcy Court's finding that the MK Defendants did not owe IBG a fiduciary duty. (*See* AD ECF No. 1058 at 129-30.)

Given that a fiduciary relationship did not exist between the MK Defendants and IBG, a duty to disclose did not arise in this case. *See Moore*, 599 S.E.2d at 472 (finding that parties in a fiduciary relationship owe each other duties to disclose). The MK Defendants also did not owe IBG a duty to disclose due to Meyers' CPA certification. IBG did not retain the MK Defendants to serve as its accountants and had no expectation of them serving as such. *See supra* pp. 20-23. Therefore, the court affirms the Bankruptcy Court's finding that the MK Defendants did not owe IBG a duty to disclose. (*See* AD ECF No. 1058 at 130 n.87.)

The court will not address whether the MK Defendants owed IBG a duty of due diligence because neither the Bankruptcy Court's order nor the Trustee's briefing address the issue. (*See* AD ECF No. 1058; CV ECF Nos. 17; 52.)

### 4. Whether the Bankruptcy Court erred by concluding that the Trustee's claims were barred by the doctrine of *in pari delicto*

*In pari delicto* is "an affirmative defense that precludes a plaintiff who participated in the same wrongdoing as the defendant from recovering damages from that wrongdoing. *In re Derivium Capital LLC*, 716 F.3d 355, 367 (4th Cir. 2013). The Bankruptcy Court concluded that *in pari delicto* precluded each of the Trustee's claims because IBG "(and therefore, also the Trustee) would equally (or to a greater degree) be a wrongful actor in regards to the alleged

impropriety and the consequences resulting from the Accounting Practice." (AD ECF No. 1058 at 118.)

The Trustee asserts that the Bankruptcy Court erred in concluding the Trustee's claims were barred by the doctrine of *in pari delicto* in the following respects:

i.   *In pari delicto* should not apply as a matter of law in adversary proceedings brought by a Chapter 7 Trustee;

ii.  *In pari delicto* does not apply as a matter of law to breach of fiduciary duty and aiding and abetting breach of fiduciary claims;

iii. The Bankruptcy Court erred as a matter of law in determining that South Carolina would apply the total abandonment and "no benefits" standard to the adverse interest exception to *in pari delicto*;

iv.  The Bankruptcy Court applied the incorrect standard in determining that the Management Defendants from IBG totally abandoned IBG's interest, IBG benefitted from their defalcations, and the MK Defendants colluded with the Management Defendants; and

v.   The Bankruptcy Court made clearly erroneous findings that: (1) the Management Defendants were acting within their express, implied, inherent, or apparent authority; (2) IBG had actual or constructive knowledge of the fraud perpetuated by the MK Defendants; (3) the Management Defendants had not totally abandoned IBG's interests; (4) IBG received a benefit from the Management Defendants' actions; (5) the MK Defendants did not collude with the Management Defendants; (6) the MK Defendants were not at greater fault than the Management Defendants; and (7) and that the public policy exception to *in pari delicto* does not apply.

(CV ECF Nos. 7 at 3-4; 17 at 16-17.) The court will address each alleged error in turn.

a. "*In pari delicto* should not apply as a matter of law in adversary proceedings brought by a Chapter 7 Trustee"

The Bankruptcy Court properly found that "[i]f the *in pari delicto* defense could have been raised against [IBG] before the commencement of the case, the doctrine also applies as a defense to actions brought against Meyers and Morgan Keegan by the Trustee under 11 U.S.C. § 541, since the Trustee stands in the shoes of [IBG]." (AD ECF No. 1058 at 78.) In *Derivium Capital*, the Fourth Circuit determined that *in pari delicto* applies to a bankruptcy trustee asserting claims under 11 U.S.C. § 541. 716 F.3d at 367 ("[T]o the extent that *in pari delicto* would have barred a debtor

from bringing suit directly, it similarly bars a bankruptcy trustee – standing in the debtor's shoes – from bringing suit[.]").  The Trustee contends that *Derivium Capital* was "wrongly decided" because it reaches "a patently absurd result in a system designed to protect creditors[.]"  (CV ECF No. 17 at 88-89.)  However, the Fourth Circuit's holding in *Derivium Capital* is binding on this court.  *See United States v. Williams*, No. 4:12-CR-00969-RBH, 2014 WL 971749, at *5 (D.S.C. Mar. 12, 2014) ("The Court . . . must follow the established precedent of this Circuit.").  Thus, the court affirms the Bankruptcy Court's ruling that *in pari delicto* applies as a defense to claims asserted by a bankruptcy trustee under 11 U.S.C. § 541.  (AD ECF No. 1058 at 78.)

b. "*In pari delicto* does not apply as a matter of law to breach of fiduciary duty and aiding and abetting breach of fiduciary claims"

The Trustee asserts the Bankruptcy Court erred by applying *in pari delicto* to the Trustee's breach of fiduciary duty and aiding and abetting a breach of fiduciary duty claims.  (CV ECF No. 17 at 90.)  Specifically, the Trustee contends that a "fiduciary duty" exception bars the application of *in pari delicto* to these claims as a matter of law.  (*Id.* at 90-92.)  The Trustee is mistaken. Neither Nevada law (which governs the aiding and abetting a breach of fiduciary duty claim) nor South Carolina law (which governs the breach of fiduciary duty claim) recognize this exception. In fact, South Carolina courts have applied *in pari delicto* to breach of fiduciary duty claims and Nevada courts have applied *in pari delicto* to aiding and abetting a breach of fiduciary duty claims. *See Myatt v. RHBT Fin. Corp.*, 635 S.E.2d 545, 548 (S.C. Ct. App. 2006) (affirming summary judgment on claim for breach of fiduciary duty based on *in pari delicto* grounds under South Carolina law); *In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011) (discussing application of *in pari delicto* to both breach of fiduciary and aiding and abetting a breach of fiduciary claims under Nevada law*)*; *USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1229-30 (D. Nev. 2011) (applying *in pari delicto* to aiding and abetting a breach

of fiduciary duty claim under Nevada law).  Accordingly, the Bankruptcy Court did not err in applying the doctrine of *in pari delicto* to the Trustee's breach of fiduciary duty and aiding and abetting a breach of fiduciary duty claims.

      c.   <u>"The Bankruptcy Court erred as a matter of law in determining that South Carolina would apply the total abandonment and 'no benefits' standard to the adverse interest exception to *in pari delicto*"</u>

Both South Carolina and Nevada courts have recognized the "adverse interest exception" to the imputation of an agent's acts and knowledge to a corporation.  Under the adverse interest exception, an agent's knowledge and wrongs are not imputed to the corporation when the agent's actions are adverse to the corporation's interests.  *Myatt*, 635 S.E.2d at 547 (citing *Little v. S. Cotton Oil Co.*, 153 S.E. 462, 463 (S.C. 1930)); *see also USACM Liquidating Trust*, 764 F. Supp. 2d at 1218 (under the adverse interest exception, "an agent's knowledge will not be imputed to the corporation when the agent is acting on his own behalf and not on behalf of the corporation") (citing *Keyworth v. Nev. Packard Mines Co.*, 186 P. 1110, 1113 (Nev. 1920)).  Thus, the adverse interest exception can preclude the application of *in pari delicto* against a corporation in a suit for its agent's wrongs.

As the Bankruptcy Court noted, the extent of adversity required to invoke the adverse interest exception and prevent imputation varies by jurisdiction.  (AD ECF No. 1058 at 84.)  Like the majority of jurisdictions, Nevada law employs the "total abandonment" standard.  *In re Amerco Derivative Litigation*, 252 P.3d at 695.  Under the total abandonment standard, the adverse interest exception does not apply unless the agent's actions are completely adverse to the corporation and provide no benefit to the corporation.  *Id.*  However, while South Carolina courts have recognized and applied the adverse interest exception, they have not specified the extent of adversity required to invoke the exception. *See Myatt*, 635 S.E.2d at 547 ("[T]he adverse interest exception applies

where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests.").

At trial, the Trustee claimed the adverse interest exception applied, arguing that "knowledge of the alleged impropriety of the Accounting Practice cannot be imputed to [IBG] because the Management Defendants' actions were clearly adverse to [IBG]'s interest." (AD ECF No. 1058 at 83.)  As a result, the Bankruptcy Court had to determine how South Carolina's "highest court would rule" on the extent of adversity required under the adverse interest exception.  (*Id.*)  The Bankruptcy Court ultimately concluded it would be reasonable to predict the Supreme Court of South Carolina would apply a standard that "requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception." (*Id.*)

On appeal, the Trustee argues that the South Carolina standard for the adverse interest exception is "clearly adverse" rather than "total abandonment."  (CV ECF No. 17 at 100.)  Specifically, they claim that the agent's actions must only be "clearly adverse" to the principal's interest for the exception to apply under *Myatt*.  (*Id.* at 100-01.)

As this issue presents a question of law, the court reviews the Bankruptcy Court's findings *de novo*.  Since "the South Carolina Supreme Court has spoken neither directly nor indirectly on the particular issue before us, [the court is] called upon to predict how that court would rule if presented with the issue."  *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Associates, Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).

The court agrees with the Bankruptcy Court and finds that South Carolina would apply the total abandonment standard for the adverse interest exception.  Contrary to the Trustee's assertions, *Myatt* does not suggest South Carolina has adopted a clearly adverse standard.  In *Myatt*, the Court of Appeals for South Carolina broadly described the adverse interest exception, finding that it

applies "where the actions of one wrong-doer, usually an agent, are clearly adverse to the other party's interests." 635 S.E.2d at 547. However, *Little*, the Supreme Court of South Carolina decision cited for that proposition, does not use the language "clearly adverse." Instead, *Little* defined the adverse interest exception as the "general rule . . . that when an agent is engaged in a transaction in which he is interested adversely to his principal, the principal will not be charged with knowledge of the agent acquired therein." *Id.* Thus, *Myatt* is not determinative of whether the Supreme Court of South Carolina would adopt a clearly adverse standard. Additionally, this court does not interpret *Myatt* to expound a clearly adverse standard for the adverse interest exception. Other courts have used various degrees of adversity to describe the exception but have continued to require total abandonment to apply the exception. For example, Maryland courts define the adverse interest exception as an exception that "permits a principal to avoid imputation when the agent's interests are *sufficiently* adverse to the principal's interests" but require total abandonment to apply the exception. *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-73 (4th Cir. 1995) (emphasis added).

In contrast, the Supreme Court of South Carolina's consideration of the relative benefit to a corporation from its agent's acts to determine the corporation's liability for its agent's acts in *Citizens' Bank v. Heyward*, 133 S.E. 709 (S.C. 1925) suggests the total abandonment standard would apply in South Carolina. In *Citizens' Bank*, the Supreme Court of South Carolina concluded the agent, a bank president, was acting within the scope of his agency when he negotiated a loan with a customer, which provided for the payment of eight (8) percent interest to the bank and two (2) percent interest to the bank president personally. *Id.* Even though the agent's act of accepting the additional two (2) percent commission was for his personal benefit and was adverse to the bank due to its unlawful nature, the Supreme Court of South Carolina stated that "it is a mistake to

51

suppose that the bank was not benefited by the fraudulent act of [the bank president], as it could not be carried into effect, except by securing a borrower for the bank, out of whom it made several thousand dollars." *Id.* at 713.  Consequently, the Supreme Court of South Carolina concluded the agent's act was done in the course of his agency and by virtue of his authority as agent, thus the bank could be held liable for usury based on the acts of its agent. *Id.* at 715.

Thus, it would be reasonable to predict the Supreme Court of South Carolina would follow the majority of jurisdictions and apply a standard that requires total abandonment of the principal's interest and no benefit to the principal in order to apply the adverse interest exception.[5]  Such a standard "avoids ambiguity where there is a benefit to both the insider and the corporation, and reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party[.]"  *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010).

Accordingly, the Bankruptcy Court did not err in finding the Supreme Court of South Carolina would apply a total abandonment standard to the adverse interest exception.

---

[5] *See, e.g.*, *Gray v. Evercore Restructuring L.L.C.*, 544 F.3d 320, 325 (1st. Cir. 2008) (applying Massachusetts law); *Williams Electronics Games, Inc. v. Garrity*, 366 F.3d 569, 575 (7th Cir. 2004) (applying Illinois law); *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003) (applying New York law); *Beck v. Deloitte & Touche*, 144 F.3d 732, 736 (11th Cir. 1998) (applying Florida law); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771-73 (4th Cir. 1995) (applying Maryland law); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1311 (M.D. Fla. 2009); *In re Nat'l Century Fin. Enter., Inc. Inv. Litig.*, 604 F. Supp. 2d 1128, 1143 (S.D. Ohio 2009); *Fine v. Sovereign Bank*, 634 F. Supp. 2d 126, 139 (D. Mass. 2008); *Ladd Furniture, Inc. v. Ernst & Young*, No. 2:95-CV-00403, 1998 WL 1093901, at *7 (M.D.N.C. Aug. 27, 1998); *In re Verilink Corp.*, No. 06-8-566-JAC-11, 2009 WL 4609308 (Bankr. N.D. Ala. Dec. 3, 2009); *Kemin Indus., Inc. v. KPMG Peat Marwick LLP*, 578 N.W.2d 212, 216 (Iowa 1998); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007); *Kirschner v. KPMG, LLP*, 938 N.E.2d 941, 952 (N.Y. 2010); *MCA Financial Corp. v. Grant Thornton, LLP*, 687 N.W. 2d 850, 857 (Mich. App. Ct. 2004); *Goldstein v. Union Nat'l Bank*, 213 S.W. 584, 591 (Tex. 1919).

d.  "The Bankruptcy Court applied the incorrect standard in determining that the Management Defendants from IBG totally abandoned IBG's interest, IBG benefitted from their defalcations, and the MK Defendants colluded with the Management Defendants"

After combing the Trustee's briefs to discern any argument on this issue, the court believes this issue is addressed to the Bankruptcy Court's decision that Nevada and South Carolina state courts would reject the holding in *Official Committee of Unsecured Creditor of Allegheny Health Education & Research Foundation v. PriceWaterhouseCoopers, LLP* (*Allegheny*), 989 A.2d 313 (Pa. 2010).[6]

At trial, the Trustee asserted "that both Nevada and South Carolina courts would follow the public policy considerations adopted by the Supreme Court of Pennsylvania's holdings in . . . *Allegheny*[.]"  (AD ECF No. 1058 at 102.)  In *Allegheny*, the defendant auditor allegedly issued a clean opinion of the principal corporation's finances despite knowing the corporation's agents had misstated those finances and thereby hid substantial operating losses.  989 A.2d at 315.  The clean opinions purportedly "conceal[ed] the corporation's deepening insolvency and facilitat[ed] management's continuation of a ruinous business strategy while thwarting essential, remedial intervention by the board of trustees."  *Id.*  While considering the case on appeal, the Third Circuit certified two (2) questions to the Supreme Court of Pennsylvania to determine whether the agents' wrongdoing could be imputed to the corporation when the non-innocent, colluding auditor sought to invoke *in pari delicto*.  *Id.* at 314-15.

The Supreme Court of Pennsylvania noted that because imputation rules "justly operate to protect third parties on account of their reliance on an agent's actual or apparent authority," imputation should not apply "where both the agent and the third party know very well that the

---

[6] The court observes that the Trustee did not organize either of their briefs by the issues presented in their Statement of Issues.  (*See* ECF Nos. 7; 17; 52.)  Accordingly, the court had to unravel the assertions in the Trustee's briefs to identify arguments relevant to each issue.

agent's conduct goes unsanctioned by one or more of the tiers of corporate governance." *Id.* at 336. As a result, the Supreme Court of Pennsylvania considered it "ill-advised, if not perverse" to charge a principal corporation "with knowledge as against a third party whose agents actively and intentionally prevented those in [the corporation's] governing structure who were non-participants in the fraud from acquiring such knowledge." *Id.* It also categorically "decline[d] to consider a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company." *Id.* at 318. Thus, the Supreme Court of Pennsylvania held that when an outside auditor engages in "secretive, collusive conduct" with corporate agents, the colluding auditor may not rely on an imputation defense. *Id.* at 339.

Ultimately, the Bankruptcy Court was "not convinced that Nevada or South Carolina state courts would follow the approach taken in *Allegheny*." (AD ECF No. 1058 at 103.) The Trustee challenges this finding on appeal, claiming Nevada and South Carolina courts would follow *Allegheny* and decline "to impute malevolent insiders' knowledge where the insiders had colluded with outside professionals to generate false reports." (CV ECF No. 17 at 92-95.)

This court agrees with the Bankruptcy Court that Nevada and South Carolina state courts would not follow the imputation approach taken in *Allegheny* in this case. Since *Allegheny* was decided in 2010, it appears that no other jurisdiction has adopted *Allegheny*'s approach to imputation. In fact, numerous courts have questioned the policy considerations enunciated in *Allegheny*. In *Kirschner*, the Court of Appeals of New York found that *Allegheny* "may be viewed as creating a double standard whereby the innocent stakeholders of the corporation's outside professionals are held responsible for the sins of their errant agents while the innocent stakeholders of the corporation itself are not charged with knowledge of their wrongdoing agents." 938 N.E.2d at 958. The United States District Court for the District of Nevada, applying Nevada law, similarly

noted that "the Pennsylvania Supreme Court's requirement [in *Allegheny*] that the auditor act in good faith creates a double standard. [The liquidating corporation's] innocent stakeholders would be able to avoid the bad faith conduct of [its] agents imputed to [it], but [the auditing firm's] innocent stakeholders would have no such opportunity." *USACM Liquidating Trust*, 764 F. Supp. 2d at 1228 n.3. The Delaware Court of Chancery also observed that *Allegheny* would "open a floodgate of *ex post* auditor liability" in *Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 318 (Del. Ch. 2015).

Additionally, the holding in *Allegheny* would not apply to the facts of this case. *Allegheny* explicitly held that "imputation is unavailable relative to an auditor which has not dealt materially in good faith with the client-principal. This effectively forecloses an *in pari delicto* defense for scenarios involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment." 989 A.2d at 339. Thus, even if Nevada and South Carolina courts accepted *Allegheny*, it would not apply here because IBG did not engage the MK Defendants to serve as its accountants or auditors. *See supra* pp. 20-23.

As a result, the court finds the Bankruptcy Court did not err in concluding that South Carolina and Nevada courts would reject the Supreme Court of Pennsylvania's holding in *Allegheny*.

e. Allegedly Erroneous Findings

i.  "*[T]he Management Defendants were acting within their express, implied, inherent, or apparent authority*"

The Bankruptcy Court's finding that "the Management Defendants, including Sturgill and Hargrett, had authority, whether actual or apparent, to implement accounting policies and practices and issue financial statements on behalf of [IBG] and in fact implemented and maintained the use of the Accounting Practice" is not clearly erroneous. (AD ECF No. 1058 at 81-82.)

Although IBG's bylaws and officer employment contracts do not specifically confer authority over the corporation's accounting practices and financial statements, they gave the Management Defendants broad authority over the company's business affairs and operations that would include control over the company's financial affairs. IBG's bylaws provide "[t]he business and affairs of th[e] corporation shall be managed by its Board of Directors" and the CEO "shall have general and active management of the business of the corporation." (CV ECF No. 30 at 7, 9.) Sturgill's, Brad Cordell's, and Wade Cordell's employment contracts also granted them "general supervision, direction, and control of the business and the affairs of the operations of the Company." (CV ECF No. 41 at 117, 131, 140.)

Corporate management typically has authority to issue and approve financial statements and practices. *See, e.g.*, *USACM Liquidating Trust*, 764 F. Supp. 2d at 1218 (citing *Kirschner*, 938 N.E.2d at 950-51 ("everyday activities central to any company's operation and well-being – such as issuing financial statements, accessing capital markets, handling customer accounts, moving assets between corporate entities, and entering into contracts" constitutes conduct within the scope of a corporate officer's authority) and *In re Parmalat Sec. Litig.*, 659 F. Supp. 2d 504, 518 (S.D.N.Y. 2009) (stating that the "preparation, approval and oversight of financial statements are ordinary functions of management" which typically would be attributed to the company)); *Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) ("The approval and oversight of [financial] statements is an ordinary function of management that is done on the company's behalf, which is typically enough to attribute management's actions to the company itself."). Accordingly, management of IBG's financial affairs would be within the Management Defendants' scope of authority even without express designation in the bylaws or their employment contracts.

The court also agrees with the Bankruptcy Court that "the authority to implement accounting policies and issue financial statements would not only appear to be inherent in [IBG]'s employment of a [CEO] and [CFO] but would be the usual impression of anyone dealing with the company." (AD ECF No. 1058 at 81.) As both Sturgill and Hargrett represented they were CPAs and held positions that would typically entail oversight of corporate financial statements, anyone interacting with the company would assume they were responsible for issuing and approving IBG's financial statements and practices.

Finally, the court rejects the Trustee's argument that the Bankruptcy Court's finding is erroneous because the Management Defendants "did not have authority to falsify IBG's financial statements and defraud the company." (CV ECF No. 17 at 97.) A corporation is "responsible for the acts of its authorized agents even if particular acts were unauthorized," because the "risk of loss from the unauthorized acts of a dishonest agent falls on the principal that selected the agent." *USACM Liquidating Trust*, 764 F. Supp. 2d at 1218 (citing *Kirschner*, 938 N.E.2d at 951). This general rule holds "even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud[.]" *Kirschner*, 938 N.E.2d at 951. Thus, the Management Defendants were acting within their authority despite performing unauthorized acts.

> ii.    *"IBG had actual or constructive knowledge of the fraud perpetuated by the MK Defendants"*

After an extensive review of the Trustee's briefing, the court cannot discern any argument on this issue. (*See* CV ECF Nos. 17; 52.) Accordingly, the Trustee waived its challenge. *See Olano*, 507 U.S. at 733.

  *iii.*  *"[T]he Management Defendants had not totally abandoned IBG's interests" and*
     *"IBG received a benefit from the Management Defendants' actions"*

  As both the Bankruptcy Court and the Trustee acknowledge, application of the adverse interest exception "requires a fact-intensive inquiry that must be conducted on a case-by-case basis." (AD ECF No. 1058 at 86; CV ECF No. 17 at 102.) The Bankruptcy Court rigorously engaged in this fact-intensive analysis and determined "the Management Defendants did not totally abandon the interests of [IBG] through their actions, including the use of the Accounting Practice" because "Management Defendants' actions provided benefit to [IBG]." (AD ECF No. 1058 at 100.)

  The Bankruptcy Court found that the Accounting Practice "resulted in the influx of millions of dollars" to IBG that paid IBG's "legitimate expenses" and funded IBG's "growth and operations[.]" (*Id.* at 94-95.) Specifically, money raised as a result of the Accounting Practice funded IBG's outside securities counsel, past due payroll and taxes, the buyback of potentially improperly issues shares and territory licenses, the purchase of new technology, the hiring of new personnel, and expenses related to the startup of IBG's Barbourville check processing facility. (CV ECF Nos. 31 at 152-53; 44 at 83; 45 at 63-64, 73; 48 at 26.)

  The Trustee asserts that the Bankruptcy Court's finding that the Management Defendants' actions did not totally abandon IBG's interests because they provided a benefit to IBG is erroneous, claiming their experts "demonstrated that any 'benefit' to IBG from capital raised in reliance upon the false and misleading financial statements was illusory, as these funds created only liabilities for the company." (CV ECF No. 17 at 102.) The Bankruptcy Court expressly rejected this argument, concluding

   [W]hen the Accounting Practice was implemented, it was not a situation where [IBG]'s operations were on the brink of collapse and that, but for the capital raised, [IBG] would not have been able to continue its operations. Rather, when the

> Accounting Practice was implemented, capital was being raised and used to assist [IBG] with expanding its business, which in turn resulted in [IBG] experiencing unprecedented growth. Therefore, the Court is not convinced by the Trustee's arguments or evidence that the Management Defendants' actions provide no benefit to [IBG].

(AD ECF No. 1058 at 96 n.56.)

"Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. Here, the Bankruptcy Court's finding that the Management Defendants' actions provided a benefit to IBG and therefore did not abandon IBG's interests is contrary to the Trustee's preferred finding but supported by significant evidence in the record. Therefore, it is not clearly erroneous.

> iv.    *"[T]he MK Defendants did not collude with the Management Defendants"*

After rejecting the Trustee's assertion that South Carolina and Nevada courts would embrace the holding in *Allegheny*, the Bankruptcy Court found that "to the extent South Carolina or Nevada recognizes a collusion exception . . . Meyers and Morgan Keegan did not participate in secretive, collusive conduct with Management Defendants in connection with the Accounting Practice to defraud or otherwise act against [IBG]." (AD ECF No. 1058 at 104.) The Trustee asserts "there is no way the Bankruptcy Court could have reached its conclusion had it taken an independent and complete review of the record." (CV ECF No. 17 at 96.) The court disagrees.

The record demonstrates the MK Defendants did not know the Accounting Practice was improper until the TS Report was released. *See supra* pp. 24-27. It also shows the MK Defendants did not conceal the fraudulent nature of the Accounting Practice, cause IBG to adopt or use fraudulent accounting practices, or encourage the Management Defendants' breaches of fiduciary duty. *See supra* pp. 20-24, 27-31. Thus, substantial evidence supports the Bankruptcy Court's

conclusion that the MK Defendants did not collude with the Management Defendants to defraud IBG through the Accounting Practice.  As a result, the finding is not clearly erroneous.

> v.      *"[T]he MK Defendants were not at greater fault than the Management Defendants"*

Both South Carolina and Nevada courts apply *in pari delicto* when the plaintiff is at equal or greater fault than the defendant.  *See Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888, 893 (S.C. 2015); *Magill v. Lewis*, 333 P.2d 717, 719 (Nev. 1958).  Similarly, *in pari delicto* is only applicable in private causes of action for damages under federal securities laws when "the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).

In its assessment of the "greater fault" exception to *in pari delicto*, the Bankruptcy Court found the MK Defendants do not bear greater fault than IBG for the alleged injuries to IBG resulting from the Accounting Practice.  (AD ECF No. 1058 at 113.)  Specifically, it concluded that "the evidence simply does not demonstrate that Meyers and Morgan Keegan were masterminds of a scheme or otherwise controlled [IBG]'s operations, such that they should be considered more to blame in this matter than [IBG]."  (*Id.* at 114.)  Instead, "[IBG], through its management, bears the greater fault in this matter for the implementation and consequences of the use of the Accounting Practice, including any capital raises during the time period that the policy was in use."  (*Id.*)

The Trustee contends IBG's fault is not equal to or greater than that of the MK Defendants.  (CV ECF No. 17 at 99-100.)  Citing no evidence in the record, they claim the Bankruptcy Court's finding on fault is clearly erroneous because the "Management Defendants could not have implemented this scheme, caused this years-long harm, and attempted to enrich themselves

through the exit strategy without the MK Defendants." (*Id.* at 99.)  Once again, the Trustee is incorrect.

The evidence in the record clearly establishes that the Accounting Practice did not originate with the MK Defendants.  The MK Defendants did not know the Accounting Practice was fraudulent until the TS Report was released in July 2008 and were not engaged to audit the company's financials or implement accounting practices.  *See supra* pp. 21-24.  In fact, the MK Defendants were so far removed from implementing accounting policies and issuing financial statements that IBG was contractually obligated to provide them with accurate and complete financial information.  *See supra* pp. 21-23.

While the exact origin of the Accounting Practice is unclear, it appears that Sturgill and Grafton were responsible for the creation and implementation of the policy.  Sturgill prepared IBG's financial statements until September 2006 and disseminated the 2005 balance sheet, the first set of financial statements in the record including an increased accounts receivable figure.  (CV ECF No. 19 at 97, 99.)  Grafton then concealed the impropriety of the practice by issuing an unqualified audit opinion that IBG's financials were prepared in conformity with GAAP each year from 2003 to 2008.  (CV ECF No. 44 at 1, 2, 10, 20, 33, 48, 62.)

The record also shows the MK Defendants did not conceal the impropriety of the Accounting Practice.  Unlike Sturgill who attempted to obscure the impropriety of the practice, Meyers promoted disclosure of the Accounting Practice to institutional investors.  *See supra* pp. 27-28.

As the record demonstrates the MK Defendants did not create, implement, or conceal the Accounting Practice, the MK Defendants could not be at greater fault than IBG for the harms resulting from the Accounting Practice.  Given the significant evidence in the record supporting

the Bankruptcy Court's finding that the MK Defendants were not at greater fault, the court cannot conclude the Bankruptcy Court committed clear error.

>            vi.     *"[T]he public policy exception to in pari delicto does not apply"*

In a final attempt to escape the application of *in pari delicto*, the Trustee asserts the Bankruptcy Court erred in finding that "public policy considerations should not bar the application of *in pari delicto* in this matter."  (AD ECF No. 1058 at 118.)  Specifically, the Trustee claims "[p]ublic policy does not permit the MK Defendants to cloak themselves in this defense and escape liability for their destruction of IBG."  (CV ECF No. 17 at 104.)

The Bankruptcy Court devoted almost four (4) pages to rejecting this argument.  The Bankruptcy Court first concluded IBG "should not be able to recover damages against a third party for a wrong that it itself created and implemented."  (AD ECF No. 1058 at 116.)  It then found that "as Morgan Keegan and Meyers received no compensation from [IBG], it appears that Morgan Keegan or Meyers would not be unjustly enriched by allowing the application *in pari delicto*."  (*Id.*)  Finally, the Bankruptcy Court noted that a recovery by the Trustee in this matter would not significantly deter similar alleged wrongdoing in the future, observing that "[a]ny wrong-acting securities professional would still be subject to possible enforcement actions" and allowing "a recovery in this matter could also effectively excuse fraudulent accounting practices by a corporation[.]"  (*Id.* at 117-18.)

Such conclusions are well-supported by the record.  The Accounting Policy was created and implemented by IBG's employees and auditor, not the MK Defendants.  *See supra* p. 20.  Morgan Keegan and Meyers also did not receive "any compensation, period, related to any investments at IBG."  (CV ECF No. 43 at 240.)  Furthermore, the record shows securities professionals in this case were subject to other enforcement actions.  In 2011, the South Carolina

Office of the Attorney General filed an Administrative Proceeding before the Securities Commissioner of South Carolina against IBG, Wade Cordell, Brad Cordell, Blevins, Sturgill, and Hargrett for allegedly engaging in acts that constitute violations of the South Carolina Uniform Securities Act.  (AD ECF No. 1058 at 70.)  As a result of the proceeding, the Management Defendants received a lifetime ban from selling securities in South Carolina.  (*Id.*)  Hargrett and Donald Grafton, the owner of Grafton, subsequently pled guilty to federal securities charges relating to their roles in preparing IBG's financial statements in 2014.  (*Id.* at 8, 10, 70.)

A review of the entire record does not leave this court "with the definite and firm conviction that a mistake has been committed" by the Bankruptcy Court.  *Hall*, 664 F.3d at 462 (citing *U.S. Gypsum Co.*, 333 U.S. at 395).  Accordingly, the Bankruptcy Court's finding that "public policy considerations should not bar the application of *in pari delicto* in this matter" is not clearly erroneous.  (AD ECF No. 1058 at 118.)

### 5.  Whether the Bankruptcy Court's finding that the Trustee did not adequately prove damages caused by the MK Defendants misrepresented the evidence and misapplied the law

The Trustee maintains the Bankruptcy Court's findings and conclusions regarding the Trustee's damages claims erred as follows:

i.    In holding that IBG's net operating losses were not the foreseeable and proximate result of the MK Defendants' conduct;

ii.   In finding that there were legally significant intervening causes of IBG's net operating losses;

iii.  In not applying the doctrine of joint and several liability to IBG's net operating losses; and

iv.   In holding that the evidence proving the amount of IBG's damages caused by the MK Defendants was not reliable, because any material misstatements in IBG's financial records had been adjusted, thereby rendering the restated financial statements prepared after the management ouster and reviewed by the Trustee's expert reliable, and alternatively because the law does not allow the MK Defendants to avoid liability by rendering IBG's financial statements unreliable through their own misconduct.

(CV ECF Nos. 7 at 4-5; 17 at 17-18.)  The court will address each issue in turn.

a. Proximate causation, foreseeability, and intervening causes of IBG's net operating losses

Although the Bankruptcy Court concluded the Trustee's causes of action were "all fully barred by *in pari delicto*," it considered the Trustee's causes of action on their merits.  (AD ECF No. 1058 at 119.)  As causation is an essential element of each of the Trustee's claims, the Bankruptcy Court first considered whether "Meyers and Morgan Keegan's actions/inaction relating to the Accounting Practice caused [IBG]'s net operating losses from the time that the April 2006 CIM was finalized until [IBG]'s bankruptcy filing." (*Id.*)

At trial, the Trustee only presented one (1) theory of damages: damages equal to IBG's total operating losses.  (*Id.* at 120.)  The Trustee argued that as a result of the MK Defendants' failure to affirmatively disclose, IBG continued to operate and incur losses for a number of years which eventually caused the prolonged collapse of the company and enabled the Management Defendants to embezzle funds from the company.  (*Id.*)

The Bankruptcy Court ultimately determined that the "evidence [presented] at trial fails to demonstrate that Meyers and Morgan Keegan independently and proximately caused [IBG]'s alleged net operating losses." (*Id.*)  In arriving at this conclusion, the Bankruptcy Court observed that "the alleged operating losses are too tenuously connected to Meyers and Morgan Keegan's actions to meet the foreseeability requirement" of proximate causation and noted nine (9) intervening causes of IBG's operating losses.  (*Id.* at 125-26.)  On appeal, the Trustee maintains the Bankruptcy Court erred in holding that the Trustee did not prove causation and foreseeability and concluding that intervening causes of IBG's harm existed.  (CV ECF No. 17 at 105.)

Here, the record demonstrates that IBG's alleged damages would have happened with or without the involvement of the MK Defendants.  The MK Defendants did not cause IBG to

implement or utilize the Accounting Practice. *See supra* pp. 20-24. To the contrary, Meyers promoted disclosure about the practice and encouraged IBG to change it. *See supra* pp. 24, 27-28.

The MK Defendants also did not secure investments that caused IBG to continue its operations in the face of growing losses. The MK Defendants failed to secure a single institutional investment in IBG and were uninvolved with IBG's friends and family offering, sale of territory licenses, issuance of promissory notes, and 2009 capital raise. (CV ECF No. 43 at 27, 195-96, 201, 215-16.) Furthermore, the MK Defendants did not authorize or allow any use of Meyers' or Morgan Keegan's names on any materials used by IBG to solicit non-institutional investors. (CV ECF No. 39 at 182.)

In contrast, IBG perpetuated and fostered the Accounting Practice. Sturgill and later Hargrett were responsible for IBG's financial statements while Grafton was responsible for the company's audits. *See supra* p. 20. IBG also failed to change the practice despite being on notice of its impropriety. E&Y instructed IBG how to fix its "accounting issues[,]" Hargrett recommended changing the Accounting Practice to management and the Board, and Meyers advised the company's management to "go to the most conservative accounting possible." (CV ECF Nos. 30 at 38; 43 at 29, 103-04, 197-98, 219-20; 44 at 78, 83, 88, 91; 45 at 71-72.) But despite these warnings, IBG continued to use the policy. In fact, the Board unanimously voted to continue with the Accounting Practice in January 2007. (CV ECF No. 43 at 29, 103-04.)

Additionally, the Bankruptcy Court correctly noted there were other causes for IBG's operating losses wholly unconnected to the Accounting Practice and the MK Defendants. (AD ECF No. 1058 at 125.) Such intervening factors include:

(1) IBG's direct issuance of stock, territory licenses, and promissory notes in violation of securities law and the resulting cost associated with a rescission offer (CV ECF No. 43 at 17, 247);

(2) IBG's longstanding misuse of monies ostensibly held in trust for the benefit of its customers to pay its operating expenses, which led to the Initial Ouster (*Id.* at 26, 30-31, 64);

(3) The removal of founders and key managers of IBG under allegations of wrongdoing (CV ECF Nos. 36 at 12-29; 43 at 65);

(4) Illegal payment of sales commissions to unlicensed personnel (CV ECF No. 43 at 45-46, 52-53);

(5) Interest IBG paid on the illegal promissory notes (*Id.* at 42-44);

(6) Costly litigation expenses incurred during the ouster of IBG's key management and resulting settlement payment to resolve the litigation (CV ECF Nos. 36 at 12-29; 43 at 64);

(7) IBG's continued use and approval of its Accounting Practice and re-hiring of Grafton with actual and constructive knowledge that the Accounting Practice had been called into question (CV ECF Nos. 30 at 38; 43 at 29, 103-04);

(8) IBG's continued direct capital raises from individuals even after the TS Report put IBG on notice that its financial statements may be materially misstated (CV ECF Nos. 34 at 5-6; 45 at 67); and

(9) Sturgill's misrepresentations of his background, which deterred institutional investors from proceeding with an investment in IBG (CV ECF No. 43 at 196-97).

(*Id.* at 125-26.)  Because intervening causes increased the amount of IBG's operating losses, the Bankruptcy Court properly rejected the Trustee's attempt to attribute the entirety of IBG's downfall to the MK Defendants.  (*Id.* at 126.)

The record does not show IBG's net operating losses were the foreseeable result of the MK Defendants' alleged misconduct.  Instead, it suggests certain factors unconnected to the MK Defendants caused IBG's net operating losses.  Thus, the Bankruptcy Court's finding that the MK Defendants did not cause IBG's net operating losses is not clearly erroneous.  *See Korman v. EagleBank*, No. PWG-12-3449, 2013 WL 3816987, at *2 (D. Md. July 22, 2013) ("So long as the bankruptcy court's account of evidence is plausible, the district court may not reverse the decision simply because it would have weighed the evidence differently.")

b.  Applicability of joint and several liability

Contrary to the Trustee's assertions, the Bankruptcy Court did not err by failing to consider whether the MK Defendants were jointly and severally liable for IBG's operating losses.  (CV ECF No. 17 at 106, 108.)  Joint and several liability relates to the satisfaction of a judgment. *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220-21 (1994) ("Joint and several liability applies when there has been a judgment against multiple defendants.").  Thus, a defendant must be liable for joint and several liability to apply.  Here, the Bankruptcy Court properly found the MK Defendants were not liable for IBG's operating losses.  (AD ECF No. 1058 at 119, 120, 126.)  It first concluded that *in pari delicto* bars the Trustee's claims against the MK Defendants and then found that the Trustee's claims fail on the merits because the MK Defendants did not cause IBG's operating losses.  (*Id.*)  Accordingly, the doctrine of joint and several liability is irrelevant in this case.

c.  Reliability of damages evidence

The Bankruptcy Court found that the Trustee "failed to meet his burden to prove damages to a reasonable certainty by relying exclusively on financial statements that, according to his expert are 'deficient, false and misleading' due to the fraudulent actions and malpractice perpetrated by [IBG]'s management and by Grafton."  (AD ECF No. 1058 at 127.)  The Trustee asserts this finding is erroneous because their damages expert, George DuRant ("DuRant"), "did not rely on IBG's fraudulent accounting statements that Grafton falsely claimed to have audited" but on "the later restated financials."  (CV ECF No. 17 at 109.)

To calculate IBG's net operating losses, DuRant relied exclusively on IBG's "restated" financial statements.  (CV ECF No. 43 at 69-71.)  However, the record demonstrates the restated financial statements are unreliable.  One of the Trustee's experts, John Freeman ("Freeman"),

opined that IBG's audited and restated financial statements are misleading and cannot be relied upon due to Hargrett's and Grafton's "fraudulent and despicable actions." (*Id.* at 59.) Freeman testified "there's a taint, a cloud over the financials as a whole that ain't going to go away." (*Id.* at 60.) He claimed IBG's fraudulent inflation of its accounts receivable figure affected other figures in its balance sheet such as IBG's bottom line, assets, and net worth as well as IBG's future financial statements. Freeman asserted "once you start to put fraud on your financials, because your financials go forward in time, next you're using last year's fraudulent numbers as a base for this year, and they just get embedded and get bigger and get wilder and get nastier." (*Id.* at 59-60.)

The MK Defendants' damages expert, Howard Zandman ("Zandman"), similarly opined that the restated financial statements are "garbage in and garbage out[.]" (*Id.* at 98.) He testified

> You can carve out the fraudulent parts, but you have to have sufficient, reliable data in order to carve out those fraudulent parts to get to what's left. Just by carving out what you think is fraudulent, or what you think is materially fraudulent, does not in itself create a good financial statement to rely upon.

(*Id.* at 99.) Thus, he claimed the restated financial statements are "not reliable" because the "underlying documents" such as "general ledgers, underlying subledgers, cash receipts journals, [and] cash disbursement journals" are not present to verify the information contained in the restated financial statements. (*Id.* at 89-90.) Moreover, Zandman noted various irregularities in the restated financial statements, including a roughly $14 million error. (*Id.* at 95-96.)

DuRant himself even expressed "concerns with respect to the legitimacy" of the restated financial statements because they were prepared at the direction of Hargrett, a man convicted of financial fraud. (*Id.* at 78.) Nonetheless, DuRant testified that he did nothing to confirm the accuracy of the restated financial statements or otherwise determine whether the statements are

GAAP-compliant. (*Id.* at 77-79.) Accordingly, the Bankruptcy Court correctly found that DuRant based his opinion on deficient financial statements.

The Trustee also asserts the Bankruptcy Court's damages finding is erroneous because "the fraud in IBG's original financials is a fraud of the MK Defendants' own doing" and "the law does not allow the MK Defendants to avoid liability by rendering IBG's financial statements unreliable through their own misconduct." (CV ECF No. 17 at 18, 109.) As this court has repeatedly emphasized, the record demonstrates the MK Defendants had no knowledge of the impropriety of the Accounting Practice, did not implement the Accounting Practice, and did not conceal IBG's use of the Accounting Practice. *See supra* pp. 20-28. In fact, the MK Defendants had no control over IBG's accounting practices and financial statements whatsoever. *See supra* pp. 20-23. Consequently, the MK Defendants are not responsible for the misleading nature of the financial statements used by the Trustee's damages expert.

The record suggests the restated financial statements relied upon by the Trustee's damages expert are deficient and demonstrates the MK Defendants were uninvolved in the fraud that ultimately rendered the restated financial statements misleading. Therefore, the Bankruptcy Court did not err in finding the Trustee "failed to meet his burden to prove damages to a reasonable certainty by relying exclusively on financial statements that, according to his expert are 'deficient, false and misleading' due to the fraudulent actions and malpractice perpetrated by [IBG]'s management and by Grafton." (AD ECF No. 1058 at 127.)

## IV.    CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the order and judgment issued by the

Bankruptcy Court on October 15, 2019 and **DISMISSES** the Trustee's appeal.


**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

March 31, 2021
Columbia, South Carolina